**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALLEN G. LINGENFELTER,
            *Plaintiff-Appellant,*

v.

MICHAEL J. ASTRUE,*
Commissioner of Social Security
Administration,
            *Defendant-Appellee.*

No. 04-56934

D.C. No.
CV-03-00264-RT

OPINION

Appeal from the United States District Court
for the Central District of California
Robert J. Timlin, Senior Judge, Presiding

Argued and Submitted
December 8, 2006—Pasadena, California

Filed October 4, 2007

Before: Robert R. Beezer, Kim McLane Wardlaw, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Beezer

*Michael J. Astrue is substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. App. P. 43(c)(2).

13427

**COUNSEL**

Troy D. Monge, Law Offices of Martin Taller, Anaheim, California, for plaintiff-appellant Allen G. Lingenfelter.

Peter D. Keisler, Assistant Attorney General, Debra W. Yang, United States Attorney, Janice L. Walli, Regional Chief Counsel, Region IX, John C. Cusker, Assistant Regional Counsel, Social Security Administration, San Francisco, California, for defendant-appellee Michael J. Astrue, Commissioner of Social Security Administration.

**OPINION**

PAEZ, Circuit Judge:

Allen Lingenfelter appeals the district court's judgment affirming an Administrative Law Judge's ("ALJ") decision denying his applications for social security disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-34, 1381-83f. Lingenfelter argues that substantial evidence does not support the ALJ's decision because the ALJ improperly rejected his testimony as not credible. We have

jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse the judgment of the district court with instructions to remand to the ALJ for the calculation and award of appropriate benefits.[1]

## I.  Background

### A.  Procedural History

On August 19, 1997, Lingenfelter filed applications for disability insurance benefits and supplemental security income, alleging that he had been disabled and unable to work since November 8, 1993 due to severe foot and knee impairments. After his applications were denied initially and upon reconsideration, Lingenfelter requested a hearing before an ALJ. At the January 4, 2000 hearing, Lingenfelter was represented by counsel and testified on his own behalf. The ALJ issued a decision denying Lingenfelter's applications on March 22, 2000, finding that Lingenfelter suffered from multiple severe impairments but was not disabled within the meaning of the SSA. The Appeals Council denied Lingenfelter's request for review and adopted the ALJ's decision as the final decision of the Commissioner on January 13, 2003.[2] Lingenfelter then filed a complaint for review with the district court, which issued an order and judgment adopting the report and recommendation of a magistrate judge and affirming the ALJ's decision. Lingenfelter timely appealed.

---

[1]Lingenfelter currently receives disability benefits on the basis of a subsequent application, filed on April 18, 2002 and not at issue here, which the Social Security Administration granted because of a material change in Lingenfelter's age. Thus, at issue here is Lingenfelter's entitlement to past benefits.

[2]In denying Lingenfelter's request for review, the Appeals Council considered additional medical evidence that he submitted on December 9, 2002. Under these circumstances, "we consider on appeal both the ALJ's decision and the additional material submitted to the Appeals Council." *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993); *see also Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000) ("We properly may consider the additional materials because the Appeals Council addressed them in the context of denying Appellant's request for review.").

## B.   Facts

The parties do not dispute most of the relevant facts. Born on May 14, 1951, Lingenfelter was 48 years old at the time of his hearing before the ALJ. He had a high school education and worked most of his adult life as a construction worker, warehouse worker, and automobile detailer. He first underwent surgery on his left knee in 1970. He suffered a work-related injury of the same knee on November 8, 1993, which has required multiple surgeries, including two knee arthroscopies in 1994 and 1996. About three years later, in November 1996, Lingenfelter started to experience significant pain in his left foot as well, and by 1997 he was experiencing severe pain in both feet.

### 1.   Medical Reports

According to the medical reports in the administrative record, more than ten doctors, including two primary treating physicians, had examined or treated Lingenfelter prior to the hearing. The doctors had diagnosed Lingenfelter with, among other things, torn lateral and medial meniscae, significant advanced osteoarthritis, degenerative joint disease, post-polio syndrome, posterior tibial tendon rupture and tendinitis, and bilateral advanced arthrosis and planovalgus deformity.

After first injuring his left knee in 1993, Lingenfelter was examined by Doctors Tony M. Deeths and P.B. Johnson, who diagnosed osteoarthritis and cartilage damage. In February 1994, orthopaedic surgeon Marshall S. Lewis performed arthroscopic surgery on Lingenfelter's knee, which revealed "torn medial and lateral menisci with osteoarthritis of the left knee and chondromalacia." Later in 1994, following reports of continued swelling and locking of the left knee, Dr. Dilibeno examined Lingenfelter and found a "large erosive hole in the lateral tibial plateau extending down (through cartilage) to bone over the weight bearing area." He also diagnosed degenerative joint disease and determined that Lingenfelter

would need a total knee replacement. On the basis of similar findings in a February 1995 examination, Dr. Daniel N. Ovadia concluded that Lingenfelter could not return to his usual work and was precluded from any prolonged standing or walking.

In 1996, Lingenfelter started seeing the first of his two primary treating physicians, knee specialist Dr. James T. Caillouette. From 1996 to 1999, Dr. Caillouette consistently reported that Lingenfelter was in pain because of his knee and feet. Following diagnostic arthroscopy, Dr. Caillouette determined that Lingenfelter's knee had "complete lateral joint collapse with bone-on-bone in the lateral joint space and significant osteophyte formation." He concluded that Lingenfelter needed a total knee replacement (arthroplasty) because of the severe pain. Dr. Caillouette also found that both of Lingenfelter's feet had experienced significant atrophy, and prescribed him a wheelchair in 1997 to help alleviate the pain. In 1998, Dr. Caillouette reported that Lingenfelter's left foot had completely collapsed. He also determined that Lingenfelter was "fully disabled from work" until he received appropriate treatment.

In 1997, Dr. Richard I. Woods examined Lingenfelter on behalf of the California Workers' Compensation Appeals Board. Lingenfelter reported to Dr. Woods that he felt constant sharp pain in his knee and feet and that "his knee stiffens up and becomes more painful after sitting for about ten minutes or holding the knee in one position for about ten minutes." Lingenfelter also reported that, because of the pain, he was unable to perform any significant activities. Dr. Woods agreed with Dr. Caillouette that Lingenfelter needed a total knee arthroplasty, as radiographs revealed advanced osteoarthritis and significant atrophy of the left thigh. He also diagnosed degenerative disorder, bilateral tibial tendinitis and rupture, and advanced arthrosis of bilateral mid feet with loss of plantar arch and collapse of the left mid foot. Dr. Woods concluded that Lingenfelter was limited to semi-sedentary work,

and even then would require the use of a cane to help alleviate pain.

In 1998, Dr. Roger Sung examined Lingenfelter on behalf of the California Department of Social Services. Dr. Sung reported that "X-rays of the left knee show severe tricompartmental arthritis with significant loss of joint space both medially and laterally [along with] marked osteophyte formation." He also diagnosed "significant left knee osteoarthritis and bilateral foot planovalgus deformity." He concluded that Lingenfelter was limited in his ability to walk but could sit for a full day with appropriate breaks. Two other state agency doctors reviewed Lingenfelter's medical records and made similar findings, concluding that he could "stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; [and] had limited use of the left lower extremity . . . and both feet."

Also in 1998, Dr. Stuart A. Green examined Lingenfelter and reviewed his medical records and X-rays for the Workers' Compensation Appeals Board. Consistent with the medical record, Dr. Green reported bilateral foot and gait deformities, absent or weak tibialis posterior function, and knee atrophy, swelling, and pain. He also agreed that Lingenfelter would require knee surgery, either immediately or in the near future. Contrary to the earlier reports, however, he concluded that Lingenfelter's lower extremity impairments were the result of post-polio syndrome, "a late manifestation of poliomyelitis that affects middle age individuals." As Dr. Green reported:

> What surprised me as I went through the medical records in this case is that no practitioner seems to have focused attention on what seems to me a critical aspect of this applicant's past history. Mr. Allen Lingenfelter, at the age of four, had severe poliomyelitis. He was in an iron lung for a while, and almost died.

In 1999, Lingenfelter began seeing his second primary treating physician, foot specialist Dr. Alexander Tischler. Dr. Tischler diagnosed "severe flatfoot deformity of both feet" and "arthritis of the tarsometatarsal joint," and determined that triple arthrodesis surgery was "a medical necessity." He also reported that Lingenfelter had severe knee and foot pain, which he stated "he could no longer live with." Dr. Tischler concluded that Lingenfelter was "totally disabled . . . and is really unable to do any work that requires any sitting or standing." By July 2000, Dr. Tischler reported that Lingenfelter was "mostly in a wheelchair" and that bilateral casts were the only treatment that helped to reduce his pain.

Finally, in 2001, after Lingenfelter underwent the recommended triple arthrodesis surgery, Dr. Ronald Smith diagnosed "status post hindfoot reconstruction with incomplete arthrodesis" and "severe pes planus with subtalar instability and rupture of the posterior tibial tendon." In his description of Lingenfelter's symptoms, Dr. Smith reported that some pain and swelling were always present, that he elevated his feet for relief, and that he used a wheelchair and crutches as aids for walking. Dr. Smith concluded that these "symptoms are consistent with the examination findings, history, and radiograph," and that Lingenfelter's pain complaints were objectively reasonable. Dr. Smith at times reported that Lingenfelter was temporarily totally disabled, but at other times reported that he was able to do sedentary work.

## 2. Lingenfelter's Testimony

At his hearing before the ALJ in January 2000, Lingenfelter testified that he had experienced constant pain since 1993, along with regular cramping, swelling, and fatigue. He described the pain in his left knee as moderate to severe but stated that "it's my feet that hurt so bad," as if "somebody [were] sticking a knife in them, and putting electricity in them, these shocks I get, are just unbelievable." He further testified that, because of the pain and fatigue, he could only

stand for 20 minutes or sit for 15-20 minutes at a time, and had to lie down at least three times a day for 30-45 minutes. He also testified that he needed to keep his legs elevated every day, even while sitting, and that the pain affected his ability to sleep.

With regard to treatment, Lingenfelter stated that he took Vicodin three times a day for pain, as prescribed by Dr. Tischler, and sought relief from severe pain by soaking his feet in buckets of ice or a bath tub filled with Epsom salt and hot water. He testified that he almost always used the cane that Dr. Caillouette prescribed in 1996, but only sometimes used crutches because they hurt his arms, and was unable to use a wheelchair because his insurance refused to approve the prescription from Dr. Caillouette. At the time of the hearing, Lingenfelter was also wearing a cast that Dr. Tischler prescribed for his right foot, but had not yet undergone the triple arthrodesis or total knee arthroplasty. He testified that he wanted to have the surgeries, which he hoped would alleviate his pain and swelling, but that his insurance company had not authorized them.

Lingenfelter testified that pain severely limited his daily activities. He stated that he had difficulty showering, could not do yard work or a lot of driving, and usually had other people shop for him, since he was otherwise able to shop for only a few things at a time. Likewise, he stated that he had trouble finishing tasks generally, because he could not sit or stand for long. He testified that he occasionally watched his daughter play sports, but that it was difficult for him because of his knee and feet.

Finally, Lingenfelter testified that he lived in a room that he rented at a friend's house and had not worked since his injury in 1993, except for a nine week period starting in February 1999. He stated that at that time he took a job washing tour buses because he had "no money, no income at all." He testified that he could not perform that work again and that he

only did so then because he "just didn't have any money" and "had to do something to live." He stated that he left the job after a week because a union job at a warehouse opened up. He was fired from that job after eight weeks, however, because he was too slow to do the work adequately. He also testified that when he returned home from work each day his "feet were so swollen," and that he "just couldn't do it anymore" because of the pain.

## C. ALJ Decision

In denying Lingenfelter's applications, the ALJ applied the five-step disability evaluation process set forth in 20 C.F.R. § 404.1520. *See Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (describing the five-step process). Because Lingenfelter's disability insurance lapsed on June 30, 1998, he had to establish that he was disabled for at least a twelve-month period between the alleged onset date, November 8, 1993, and June 30, 1998 (the "relevant time period").[3] *See Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1997) ("To qualify for disability benefits, a claimant must show that a medically determinable physical or mental impairment prevents her from engaging in substantial gainful activity and that the impairment is expected to result in death or to last for a continuous period of at least twelve months." (citing 42 U.S.C. § 423(d)(1)(A)).

The ALJ found, and the parties do not dispute, that Lingenfelter passed the hurdles set at steps one and two of the five-step process, because he was not then engaging in substantial gainful activity and he suffered from a number of severe

---

[3]As we explained in *Smith v. Bowen*, however, "reports containing observations made after the period for disability are relevant to assess the claimant's disability." 849 F.2d 1222, 1225 (9th Cir. 1988). Accordingly, in reviewing Lingenfelter's disability claim, we consider also those medical reports made after June 30, 1998, which were considered by both the ALJ and the Appeals Council.

impairments, including "degenerative joint disease of the left knee, status post multiple surgeries, and post-polio syndrome."[4] The ALJ also found, however, that Lingenfelter was not automatically presumed disabled at step three, because his condition did not meet or equal any of the impairments listed in 20 C.F.R., Pt. 4, Subpt. P, App. 1.[5] The ALJ's decision that Lingenfelter was not disabled therefore turned on his assessment in between steps three and four of Lingenfelter's residual functional capacity ("RFC"), and application of this RFC assessment at steps four and five. *See* 20 C.F.R. § 404.1520(4) ("Before we go from step three to step four, we assess your residual functional capacity. . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").

In assessing Lingenfelter's RFC, the ALJ found that Lingenfelter retained the capacity to "lift 20 pounds occasionally and 10 pounds frequently" and "stand and/or walk at least 2 hours . . . [and] sit 6 hours in an 8-hour workday," but was "unable to perform repetitive squatting, kneeling, crawling, or crouching" and "requir[ed] the use of a cane for standing and walking . . . [and] the option to stand every 30 minutes for a period of 1-2 minutes in order to regain circulation and relieve discomfort." Although the ALJ recognized that Lingenfelter testified to additional limitations that would establish a significantly lower RFC, he rejected this testimony as not "totally credible." Specifically, the ALJ found that Lingenfelter's subjective complaints were only "credible to the extent that he has required a cane and some accommodation with regard to

---

[4]The ALJ did not address the doctors' other diagnoses, most notably failing to mention any of the foot-related diagnoses, such as bilateral tibial tendon rupture and tendinitis, bilateral advanced arthrosis and planovalgus deformity, collapse of the left mid foot, and arthritis of the tarsometatarsal joint.

[5]Because we hold that Lingenfelter is entitled to an award of benefits at step five, we do not address Lingenfelter's alternate argument that the ALJ erred at step three by not expressly considering a particular listed impairment.

his complaints of cramping and poor circulation in his lower extremities." The ALJ provided two reasons for this adverse credibility finding: (1) "the consensus of medical opinion in the record essentially supports a residual functional capacity for sedentary work"; and (2) Lingenfelter's nine weeks of work in 1999 "cast significant doubt upon [his] allegation of an inability to perform any work at all."

On the basis of this RFC assessment and the testimony of a vocational expert, the ALJ found at step four that Lingenfelter was not capable of performing any of his past relevant work as a construction worker, warehouse worker, or automobile detailer. The ALJ therefore proceeded to step five, where he determined that Lingenfelter was not disabled because he retained the capacity to perform other work that existed in sufficient numbers in the national economy. In making this determination, the ALJ posed to a vocational expert both a hypothetical question based on the RFC that he assigned to Lingenfelter and hypothetical questions that included the additional limitations testified to by Lingenfelter. In response, the vocational expert testified that a person with the RFC assigned by the ALJ could perform almost a full range of sedentary work, but that sufficient jobs did not exist even at the sedentary level for a person with the additional limitations testified to by Lingenfelter. The expert testified that if an employee needed to lie down two or three times a day for up to 45 minutes, as Lingenfelter testified was necessary, that "essentially would eliminate any of the positions described, and in fact any of the positions at the sedentary level."[6]

_____

[6]The vocational expert also testified, prior to addressing Lingenfelter's testimony that he needed to lie down two or three times a day, that the sedentary job base available to a person with the RFC assessed by the ALJ would start to significantly erode if the hypothetical employee needed to stand for one to two minutes every 15-20 minutes, instead of every 30 minutes as the ALJ found. Further, if the employee had to stand four to five minutes every 30 minutes, there would be a "good 50 percent erosion" of the job base. Finally, if the employee needed to elevate his legs beyond waist level, that "would be rather impractical," and if the employee had to elevate both legs the "job base could easily be eroded . . . up to the 80 percent level."

## II.   Analysis

We review de novo a district court's judgment upholding the denial of social security benefits. *Reddick*, 157 F.3d at 720. "We may set aside a denial of benefits only if it is not supported by substantial evidence or is based on legal error." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). "Substantial evidence" means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Id.* If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner. *Id.* However, we must consider the entire record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," *Reddick*, 157 F.3d at 720, and "may not affirm simply by isolating a specific quantum of supporting evidence." *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989) (internal quotation marks omitted).

Lingenfelter argues that substantial evidence does not support the ALJ's decision because the ALJ improperly rejected his testimony as to the severity of his pain and symptoms. We agree. As we explain below, the ALJ failed to provide clear and convincing reasons for finding Lingenfelter's alleged pain and symptoms not credible, and therefore was required to include these limitations in his assessment of Lingenfelter's RFC. Because the ALJ clearly did not do so, substantial evidence does not support the ALJ's RFC assessment or step-five determination that Lingenfelter was not disabled. To the contrary, the vocational expert's testimony that sufficient jobs did not exist for a person with the limitations testified to by Lingenfelter required a finding at step five that Lingenfelter was disabled during the relevant time period. Consequently, further administrative proceedings are unnecessary, and Lingenfelter is entitled to an award of appropriate benefits.

## A. Credibility

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

Here, the Commissioner concedes that Lingenfelter met the requirement at step one, by providing evidence of underlying impairments that could reasonably be expected to produce some degree of the pain and symptoms alleged. Also, at step two, the ALJ found that there was "no evidence of malingering." The ALJ nonetheless found, however, that Lingen-

felter's testimony was credible only to the extent that he testified that he needed a cane and some accommodation for his cramping and poor circulation. As a result, the ALJ excluded from his RFC determination Lingenfelter's testimony that he could only stand or sit for about 15-20 minutes at a time, had to lie down for 30-45 minutes at least three times a day, and needed to keep his legs elevated every day, because of his constant severe pain.

We must therefore determine whether the ALJ provided clear and convincing reasons for this adverse credibility finding. As noted, the ALJ provided two reasons for the finding. First, the ALJ determined that Lingenfelter's alleged symptoms, which would preclude even sedentary work, were contrary to a consensus of the medical opinion in the record that he retained the capacity for such work. Similarly, the ALJ determined that Lingenfelter's ability to work for nine weeks in 1999 was inconsistent with the alleged severity of his symptoms.

We conclude that these reasons do not constitute clear and convincing reasons for rejecting Lingenfelter's subjective pain and symptom testimony. The ALJ's first reason provides no support for the credibility finding, because it is clear from the record that there was not in fact a consensus of medical opinion that Lingenfelter, contrary to his alleged pain and limitations, retained the capacity to perform sedentary work. The ALJ's second reason, on the other hand, was factually accurate, as Lingenfelter did testify that he worked for a brief period of time in 1999. This reason in and of itself, however, is not a sufficient basis for the ALJ's adverse credibility finding. That Lingenfelter, after the relevant time period during which he claimed to be disabled and facing difficult economic circumstances, tried to work for nine weeks and, because of his impairments, failed, is not a clear and convincing reason for concluding that his symptoms could not have precluded him from maintaining employment during the relevant time period.

## 1. Medical Opinion

**[1]** Contrary to the ALJ's determination, there was not a consensus of medical opinion that Lingenfelter retained the capacity to perform sedentary work, and therefore this reason does not support the ALJ's credibility finding. In finding a consensus, the ALJ cited to the three state agency physicians, the two doctors who examined Lingenfelter for the California Workers' Compensation Appeals Board, and Dr. Ovadia, who each made findings consistent with a capacity for sedentary work.[7] Without explanation, however, the ALJ completely ignored the medical opinions of Lingenfelter's two primary treating physicians, who expressly corroborated his alleged pain and limitations and found him incapable of *any* work.

As discussed in detail above, knee specialist Dr. Caillouette treated Lingenfelter for over three years. During this time, Dr. Caillouette reported that Lingenfelter had severe pain in his left knee and feet due to his numerous serious physical impairments, and prescribed him Vicodin, a cane, and a wheelchair for the pain. Dr. Caillouette expressly concluded that Lingenfelter was "fully disabled from work" until he received appropriate treatment: total knee replacement surgery.[8]

---

[7]Each of these doctors, however, still diagnosed serious medical impairments, and none expressly questioned Lingenfelter's subjective complaints. *See Gallant*, 753 F.2d at 1455 ("[T]he record is replete with objective clinical findings which support and confirm claimant's allegations of severe and chronic pain. There was no positive evidence that claimant was not suffering as much pain as he claimed to suffer."). Indeed, Dr. Smith, the only doctor to expressly assess Lingenfelter's subjective pain and symptoms other than his primary treating physicians, found them to be objectively reasonable in light of his injuries.

[8]Contrary to the dissent, we conclude that Dr. Caillouette's opinion that Lingenfelter was "*fully* disabled from work" is unambiguous. (Emphasis added). Dr. Caillouette made this determination after finding that Lingenfelter "is now disabled in both lower extremities" and prescribing Lingenfelter a wheelchair for the "severe pain in his feet." We also disagree with the dissent's characterization of Dr. Caillouette's February 1998 statement

Similarly, foot specialist Dr. Tischler treated Lingenfelter for about two years and determined that he was "totally disabled" and "really unable to do any work that requires any sitting or standing." Dr. Tischler also reported that Lingenfelter was "mostly in a wheelchair" by July 2000, and would be able to return to sedentary work only if his total knee replacement and triple arthrodesis surgeries were successful.

[2] In light of these medical opinions, there was clearly no consensus that Lingenfelter could perform sedentary work. Rather, Doctors Caillouette and Tischler—the only reporting physicians who examined Lingenfelter on multiple occasions and treated his impairments[9]—expressly reached the opposite conclusion, that Lingenfelter could not perform any work. Consequently, the ALJ's first reason for finding Lingenfelter's testimony not credible is unfounded and does not provide any support for the adverse credibility finding.[10]

---

as "conclusory and inadequately supported by clinical findings." In support of his opinion, Dr. Caillouette submitted more than 50 pages of medical reports and clinical findings based on three years of treatment and objective physical evidence, including X-rays, lab tests, physical examinations, and the diagnostic surgery that Dr. Caillouette himself performed.

[9]The doctors upon whom the ALJ relied were either examining or reviewing physicians, who did not treat Lingenfelter and examined him either only once or not at all. *See Reddick*, 157 F.3d at 725 ("The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.").

[10]It was also legal error for the ALJ to discount the opinions of Lingenfelter's treating physicians without providing specific and legitimate reasons for doing so. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing specific and legitimate reasons supported by substantial evidence in the record." (internal quotation marks omitted)). As we recently explained in more detail in *Orn v. Astrue*, a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record. 495 F.3d 625, 631-32 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)); *see also id.* (holding that an

## 2. Work

**[3]** To the contrary, the ALJ's second reason for finding Lingenfelter's testimony not credible was factually accurate, because Lingenfelter testified that he worked for a brief period of time in 1999. We conclude, however, that this alone is not a clear and convincing reason for rejecting Lingenfelter's subjective pain and symptom testimony.

**[4]** It does not follow from the fact that a claimant tried to work for a short period of time and, because of his impairments, *failed*, that he did not then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful employment. Indeed, we have suggested that similar evidence that a claimant tried to work and failed actually *supported* his allegations of disabling pain. *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989) (affirming the

examining physician's opinion only constitutes substantial evidence if the physician relied on "independent clinical findings that differ from the findings of the treating physician." (internal quotation marks omitted)). Moreover, even if a treating physician's opinion "is no longer entitled to controlling weight" because there is "substantial evidence in the record" contradicting the opinion, *id.* at 632 (internal quotation marks omitted), the opinion is "still entitled to deference and must be weighed using all the factors provided in 20 C.F.R. § 404.1527." *Id.* (quoting S.S.R. 96-2p at 4 (Cum. Ed. 1996), *available at* 61 Fed. Reg. 34,490, 34,491 (July 2, 1996)); *see also* S.S.R. 96-2p at 4, 61 Fed. Reg. at 34,491 ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

Of course, an ALJ cannot avoid these requirements simply by not mentioning the treating physician's opinion and making findings contrary to it. *See Embrey v. Bowen*, 849 F.2d 418, 422 n.3 (9th Cir. 1988) ("The ALJ must either accept the opinions of [claimant's] treating physicians or give specific and legitimate reasons for rejecting them."). Here, the ALJ only briefly mentioned Dr. Caillouette, and did not mention his opinion that Lingenfelter was fully disabled. The ALJ did not acknowledge Dr. Tischler at all.

ALJ's finding that the claimant was not credible, but noting that the ALJ "could easily have relied on other . . . evidence in the record to reach the opposite conclusion. Fair attempted to work in 1981, but testified that his pain forced him to stop."); *see also Rosario v. Sullivan*, 875 F. Supp. 142, 146 (E.D.N.Y. 1995) (holding that substantial evidence did not support the ALJ's decision that claimant was not disabled, in part because claimant's unsuccessful work attempt weighed in favor of a disability finding); *cf. Reddick*, 157 F.3d at 722 ("Several courts, including this one, have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.").

This reason is especially unconvincing where, as the ALJ recognized here, the individual attempted to work "only because of extreme economic necessity." Under these circumstances, it is at least as likely that the claimant tried to work in spite of his symptoms, not because they were less severe than alleged. As Lingenfelter testified, although he was able to work for a brief period of time, he attempted to do so because of his dire economic situation caused by almost six years of unemployment; and, even then, his impairments were severe enough that they prevented him from maintaining his employment.

**[5]** Moreover, Lingenfelter's failed work attempt did not even take place during the relevant time period. Lingenfelter had to prove that he was disabled for at least a twelve-month period between November 8, 1993 and June 30, 1998. His work attempt, however, as the ALJ observed, started in February 1999, "years after his injury and surgeries, thus, presumably, only after years of healing." Thus, here, the work attempt provides even less support for rejecting Lingenfelter's testimony that his subjective symptoms precluded him working during the *relevant* time period.

**[6]** In so concluding, we also find significant that the Social Security Administration permits recipients of disability bene-

fits to work on a trial basis without the trial work period adversely affecting their disability status. Specifically, when a recipient works for less than nine months, the Administration does not consider the trial work period as evidence that the individual is no longer disabled. *See* 20 C.F.R. § 404.1592; *see also Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924-25 (9th Cir. 2002) ("[T]he SSA's regulations provide for a 'trial work period' in which a claimant may 'test your ability to work and still be considered disabled.' " (quoting 20 C.F.R. § 404.1592)). By analogy, if working for almost nine months is not evidence that a disability benefit recipient is no longer disabled, then a nine week unsuccessful work attempt is surely not a clear and convincing reason for finding that a claimant is not credible regarding the severity of his impairments.

At least one of our sister circuits has also found the Administration's treatment of trial work periods significant in reviewing the denial of disability benefits. In *Parish v. Califano*, the claimant had taken a job within the time period during which she needed to establish that she was disabled, but was asked to resign because "she could not work the hours." 642 F.2d 188, 193 (6th Cir. 1981). The ALJ "relied heavily on th[is] fact . . . as substantial evidence that [the claimant] was not precluded from engaging in any substantial gainful activity" during the relevant time period. *Id.* at 192. The Sixth Circuit, however, looked for guidance in 20 C.F.R. § 404.1592: "[S]ervices rendered during the trial work period are deemed not to have been rendered for the purpose of determining whether the individual's disability ceased during such a period of trial work. It would appear reasonable to apply the same principle to an attempt to work before filing an application for benefits." *Id.* at 193. As the Sixth Circuit therefore concluded, the "[a]pproximately 32 weeks of work over more than eight years during which [claimant] has been suffering from [her impairment] can be characterized only as sporadic, not [as] 'substantial gainful activity' . . . [, which]

implies employment with some degree of regularity." *Id.* at 192.

In sum, that Lingenfelter tried to work for nine weeks in 1999 and failed is not a clear and convincing reason for the ALJ's finding that Lingenfelter was not credible when he testified about the pain and symptoms that precluded him from engaging in substantial gainful employment during the relevant time period.

### 3. Other Factors

Finally, we consider the ALJ's proffered reasons in light of the other factors that we have found relevant in reviewing an ALJ's credibility findings, and which the Social Security Administration also requires that ALJs consider in assessing credibility. These additional factors include: (1) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (2) whether the claimant takes medication or undergoes other treatment for the symptoms; (3) whether the claimant fails to follow, without adequate explanation, a prescribed course of treatment; and (4) whether the alleged symptoms are consistent with the medical evidence.[11] *See Rollins*, 261 F.3d at 857; *Bunnell*, 947 F.2d at 346; *Fair*, 885 F.2d at 602-03; *see also* S.S.R. 96-7p at 3-4 (Cum. Ed. 1996), *available at* 61 Fed. Reg. 34,483, 34,485 (July 2, 1996) (requiring ALJs to consider "all of the evidence in the case record" in assessing a claimant's subjective pain and symptom testimony, including: the "individual's daily activities"; the "location, duration, frequency, and intensity of the pain or symptoms"; "[f]actors that precipitate and aggravate the symptoms"; the "type, dosage, effectiveness, and side effects" of any medications; any other treatment or measures used for relief; functional restrictions; and any other relevant factors).

---

[11]As noted, however, an ALJ cannot reject a claimant's subjective pain or symptom testimony simply because the alleged severity of the pain or symptoms is not supported by objective medical evidence. *See Reddick*, 157 F.3d at 722.

All of these factors weigh in favor of Lingenfelter. Lingenfelter testified that he engaged in almost no recreational activities or hobbies and only limited household activities. He testified that he took prescription pain medicine twice a day, and the medical record established that he had undergone extensive additional treatment for his pain and symptoms, including physical therapy and multiple surgeries. Also, although Lingenfelter had not yet undergone the triple arthrodesis or total knee replacement surgeries at the time of the hearing, he underwent the triple arthrodesis surgery shortly after the hearing. Further, Doctors Caillouette and Tischler confirmed in their reports that Lingenfelter's insurance refused to authorize the recommended surgeries at least from 1996 to 2000. Finally, the only doctors who expressly assessed Lingenfelter's reported symptoms concluded that they were reasonable in light of the objective medical evidence.

**[7]** Thus, considering Lingenfelter's brief, unsuccessful work attempt in light of the other factors relevant to his credibility, reinforces our conclusion that the work attempt alone is not a clear and convincing reason for the ALJ's finding that Lingenfelter's testimony about his pain and physical limitations was not credible.

## B. RFC Assessment and Step-Five Determination

**[8]** Because the ALJ did not provide clear and convincing reasons for excluding Lingenfelter's pain and symptoms from his assessment of Lingenfelter's RFC, substantial evidence does not support the assessment. *See Robbins*, 466 F.3d at 883 ("In determining a claimant's RFC, . . . '[c]areful consideration' [must] be given to any evidence about symptoms 'because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone.' " (quoting S.S.R. 96-8p at 5 (Cum. Ed. 1996), *available at* 61 Fed. Reg. 34,474, 34,477 (July 2, 1996)). Nor does substantial evidence support the ALJ's step-five determi-

nation, since it was based on this erroneous RFC assessment. *See Gallant*, 753 F.2d at 1456 ("Because . . . the ALJ had no clear or convincing reasons for rejecting [claimant's allegations of persistent disabling pain], claimant's pain should have formed a part of the ALJ's question to the expert."); *see also id.* ("A hypothetical question should set out all of the claimant's impairments." (alteration and internal quotation marks omitted)).

In addition, we will not remand for further proceedings where, taking the claimant's testimony as true, the ALJ would clearly be required to award benefits:

> In cases where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's . . . testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony. Rather, we will . . . take that testimony to be established as true.

*Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1998). Here, as in *Varney*, the ALJ posed to the vocational expert not only a hypothetical question based on the ALJ's RFC assessment, but also hypothetical questions that incorporated the pain and physical limitations testified to by Lingenfelter. Although the ALJ later decided that these limitations were not credible, the vocational expert's testimony establishes that taking Lingenfelter's testimony as true, he was disabled. Dispositively, the vocational expert testified that, if an employee needed to lie down two or three times each day for up to 45 minutes, as Lingenfelter testified was necessary, this "essentially would eliminate any of the positions described, and in fact any of the positions at the sedentary level." *Cf. Gallant*, 753 F.2d at 1454 ("A man who cannot walk, stand or sit for over one hour without pain does

not have the capacity to do most jobs available in the national economy.").

**[9]** In sum, we conclude that the ALJ did not provide clear and convincing reasons for his adverse credibility determination. There was no consensus of medical opinion contrary to Lingenfelter's testimony, and his failed work attempt alone is not a clear and convincing reason for rejecting his testimony, especially in light of the record as a whole. Further, because the vocational expert testified that Lingenfelter's pain and physical limitations would eliminate any potential employment, further proceedings are unnecessary, and we reverse the judgment of the district court with instructions to remand to the ALJ for the calculation and award of benefits.[12]

**REVERSED AND REMANDED.**

BEEZER, Circuit Judge, dissenting:

The opinion of the Court fails to properly analyze the ALJ's assessment of Lingenfelter's credibility. When evaluating the credibility of a claimant's testimony, the ALJ has discretion to resolve conflicts between the opinions of examining and treating physicians. The ALJ may be justified in discounting the value of Dr. Caillouette's statements as to Lingenfelter's ability to work. Additionally, when the treating physicians' statements are ambiguous, we must permit the ALJ to interpret the statements, rather than adopting, *de novo*, our own interpretation.

---

[12]The dissent argues that it is necessary to remand Lingenfelter's claims for further proceedings because the ALJ might reject the medical opinions of Lingenfelter's primary treating physicians. We disagree. Further proceedings are unnecessary because the ALJ did not provide a legally sufficient basis for rejecting Lingenfelter's testimony, which *alone* establishes that he is entitled to benefits.

I would reverse the judgment of the district court on the narrow ground that the ALJ and the Appeals Council failed to set forth specific, legitimate reasons for disregarding the treating physicians' medical opinions. Rather than taking Lingenfelter's testimony as true and remanding only for an award of benefits, we should remand to the agency to enter specific findings regarding the treating physicians' medical opinions and to develop a revised credibility determination based on those findings.

I

When evaluating the medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve conflicts in the reports, and to determine which reports to credit and which to reject. Although the opinions of treating physicians are given deference, the ALJ may reject these opinions if, among other reasons, (1) they are contradicted by the opinion of a non-treating physician, and (2) the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Orn v. Astrue*, ___ F.3d ___, No. 05-16181, 2007 WL 2034287, at *5 (9th Cir. July 16, 2007); *Thomas*, 278 F.3d at 957. When an examining physician provides independent clinical findings that differ from the findings of the treating physician, such findings are themselves "substantial evidence." *Orn*, 2007 WL 2034287, at *5; *Thomas*, 278 F.3d at 957; *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). Under these circumstances, "it is then solely the province of the ALJ to resolve the conflict" and to decide which medical opinions to credit. *Andrews*, 53 F.3d at 1041; *see also Morgan v. Comm. of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) ("Where medical reports are inconclusive, 'questions of credibility and resolution of conflicts in the testimony are functions solely of the [Commissioner].' " (citing *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982))). Additional factors relevant to evaluating any medical opinion include the amount of relevant evidence that

supports the opinion, the quality of the explanation provided in the opinion, and the consistency of the medical opinion with the record as a whole. *Orn*, 2007 WL 2034287, at *4.

We defer to an ALJ's rational interpretation of conflicting evidence even in the context of credibility determinations, where the more rigorous "clear and convincing reasons" standard applies to the broader reasons that the ALJ is required to provide for disbelieving a claimant's subjective testimony.[1] *See Burch*, 400 F.3d at 680-81 (stating, in a case where the ALJ interpreted evidence in the context of making a credibility determination, "[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational *interpretation"); Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("We will not reverse credibility determinations of an ALJ based on contradictory or ambiguous evidence.").

In this case the medical evidence is contradictory, but weighs in favor of Lingenfelter's ability to perform sedentary work. On the one hand, a series of examining physicians found at various times throughout the insured period, based on thorough and independent clinical findings, that Lingenfelter was capable of performing sedentary work.[2] On the

---

[1]The "clear and convincing reasons" standard applies to the reasons the ALJ must provide for disbelieving the credibility of the claimant's testimony. *See Morgan*, 169 F.3d at 599. Here, these reasons include the significant weight of the medical opinion in this case, which, as discussed in the subsequent footnote, contradicts Lingenfelter's testimony that he must lie down frequently every day and elevate and ice his feet repeatedly during the day. The "specific, legitimate reasons" standard applies to the reasons the ALJ must give for disregarding the opinions of treating physicians, such as Dr. Caillouette and Dr. Tischler, when determining what the weight of the medical opinion says in a particular case.

[2]In February 1995, Dr. Ovadia stated under "work restrictions" that Lingenfelter should be precluded only from prolonged standing and walking, running or jumping. In April 1997, Dr. Woods stated that Lingenfelter was limited to "semi-sedentary work." In February 1998, Dr. Sung found that Lingenfelter had the capacity to sit for a full day, walk around the office,

other hand, the only medical evidence stating that Lingen-
felter is fully disabled from all types of work comes from Lin-
genfelter's two treating physicians, Dr. Caillouette and Dr.
Tischler. These physicians' opinions are not decisive, and Dr.
Caillouette's opinion is ambiguous and inadequately sup-
ported by clinical findings, as discussed below. Given the
overall weight of the evidence, the ALJ would be within his
discretion to credit the medical opinions of the four examin-
ing physicians while discrediting or rejecting the conclusions
of Drs. Caillouette and Tischler.

## II

Lingenfelter's first treating physician, Dr. Caillouette,
stated in February 1998 that Lingenfelter was "fully disabled
from work." The opinion of the Court interprets this to mean
"fully disabled from all types of work," rather than "fully dis-
abled from his work as a heavy laborer." The exact meaning
of Dr. Caillouette's statement is ambiguous, however, and the
statement may not be inconsistent with the examining physi-
cians' opinions stating that Lingenfelter was capable of seden-
tary work. As such, it is within the discretion of the ALJ to
interpret the statement and resolve the ambiguity.

On September 4, 1996, Dr. Caillouette noted that "Lingen-
felter essentially works as a heavy laborer," and concluded
that he had "a complete loss of pre-injury work capacity."
Lingenfelter's pre-injury work as a heavy laborer included
carrying up to 100 pounds, and carrying 50 to 75 pounds on

---

and lift up to 10 pounds frequently. In March 1998, Dr. Green conducted
a thorough examination of Lingenfelter's medical record and performed a
physical exam, and agreed with Dr. Ovadia's opinion of the extent of Lin-
genfelter's disability. In addition, a non-examining physician, Dr. Mebane,
concluded after a thorough review of Lingenfelter's medical record that
Lingenfelter could sit about 6 hours in an 8-hour workday, stand or walk
for at least two hours in an 8-hour workday, and lift up to 10 pounds fre-
quently.

a relatively frequent basis. Dr. Caillouette stated that same day that Lingenfelter was "temporarily disabled from heavy work as a laborer, and I do not anticipate his disability status changing until he has undergone further surgery." On November 15, 1996, Dr. Caillouette wrote that Lingenfelter "will either need an osteotomy of the leg or total knee arthoplasty in the near future in order to restore him to his ability to work." Both these procedures require surgery. Given that this statement comes only two months after the report stating that Lingenfelter will be disabled from heavy work as a laborer until he has surgery, it would be reasonable to conclude that Dr. Caillouette's reference to Lingenfelter's "ability to work" here means his ability to work as a heavy laborer.

On January 14, 1998, Dr. Caillouette stated that Lingenfelter was "still temporarily disabled from work." The word "still" connotes a continuation of a certain level of disability, rather than an increase in a patient's level of disability. There is nothing in the record indicating any determination by Dr. Caillouette between November 1996 and January 1998 that Lingenfelter was disabled from *all* work, and it would be unusual for a physician to make such a significant change in a patient's disability assessment without any written record of the change, and without any clinical findings to support the change. It would be reasonable to infer that "still temporarily disabled from work" refers back to Dr. Caillouette's 1996 statements of disability, the only other references in the record of Dr. Caillouette's assessment of Lingenfelter's ability to work. This inference is supported by the fact that Dr. Caillouette previously used the general term "ability to work" to likely mean "ability to work as a heavy laborer." Given this context, the February 1998 statement "fully disabled from work" (coming less than a month after the January 14 statement) is, at best, ambiguous. It could reasonably be read as meaning "fully disabled from work as a heavy laborer" or "fully disabled from all work."[3]

---

[3]Other facts in the record support the opinion of the Court's conclusion that Dr. Caillouette believed Lingenfelter to be disabled from all types of

The ambiguity in Dr. Caillouette's February 1998 statement requires us to remand the case to the agency for an appropriate interpretation of the statement. If the interpretation of Dr. Caillouette's statement would affect the ALJ's appraisal of Lingenfelter's credibility, we should allow the ALJ to further develop the record. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). If the ALJ makes the same credibility finding regardless of the interpretation of Dr. Caillouette's ambiguous statement, then additional development of the record would be unnecessary. In either case, we must give deference to the ALJ's interpretation of the ambiguous evidence, even in the context of credibility determinations, *see Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) ("[W]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation."), and we should not seek to fill the fact-finding role of the ALJ by developing, *de novo*, our own interpretation of Dr. Caillouette's ambiguous statement, s*ee INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) ("A court of appeals 'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.' ") (citation omitted).

## III

Even if the ALJ determines that Dr. Caillouette did find Lingenfelter completely disabled from all work in February 1998, the ALJ is not obligated to consider the doctor's state-

___

work by 1998. Lingenfelter revisited Dr. Caillouette with a "new problem" in November 1996—the "sudden onset of right foot pain." Dr. Caillouette stated that Lingenfelter had "severe pain" in his feet on two occasions in the fall of 1997, and prescribed a wheelchair for Lingenfelter in October 1997. I do not adopt any specific interpretation of Dr. Caillouette's statement. I only contend that there is more than one reasonable interpretation of the statement, and that it is not our prerogative to adopt, *de novo*, our own interpretation.

ment as evidence discounting the statements of Lingenfelter's examining physicians. When evaluating conflicting medical opinions, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Dr. Caillouette's 1998 statements regarding Lingenfelter's disability status are brief, conclusory and inadequately supported by clinical findings that would indicate a change in Lingenfelter's condition between 1996 and 1998.[4] If the ALJ interpreted Dr. Caillouette's 1998 statements as finding Lingenfelter to be disabled from all types of work, the ALJ could evaluate this evidence as conclusory and inadequately supported by clinical findings, and to the contrary accept the medical opinions of Lingenfelter's examining physicians.

IV

Although we give the ALJ broad discretion to weigh conflicting medical evidence when determining a claimant's credibility, the judgment of the district court must be reversed in this case. The ALJ and the Appeals Council did not articulate "specific, legitimate reasons" for disregarding the medical opinions of Lingenfelter's treating physicians. Our precedent

---

[4]The opinion of the Court states that Dr. Caillouette submitted more than 50 pages of medical reports and clinical findings to support his February 1998 opinion that Lingenfelter was disabled from all work. I disagree with this characterization of the record. The lab tests and postoperative surgery report in the record from Dr. Caillouette all date from June 1996 or earlier, before Dr. Caillouette's September 1996 report finding Lingenfelter to be disabled only from heavy work as a laborer. They provide no support for Dr. Caillouette's revised February 1998 assessment of Lingenfelter's disability. The findings from Dr. Caillouette in the record after 1996 up through February 1998 primarily consist of brief statements reporting Lingenfelter's subjective level of pain. A claimant's subjective complaints form an inadequate basis for a physician's finding of disability. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). Dr. Caillouette's clinical findings are, in my view, inadequate to support his revised 1998 assessment of Lingenfelter's disability.

is clear that, "[e]ven if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' " for doing so that are "supported by substantial evidence in the record." *Orn*, 1997 WL 2034287, at *6 (citation omitted); *see also Thomas*, 278 F.3d at 957; *Tonapetyan*, 242 F.3d at 1148. The decision of an ALJ fails this test when the ALJ completely ignores or neglects to mention a treating physician's medical opinion that is relevant to the medical evidence being discussed. *See Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). Such cases should be remanded to the agency for proper consideration of the evidence. *See id.* at 1408-09.

V

The opinion of the Court concludes that Lingenfelter is entitled to an award of benefits under the *Smolen* test. The test states that the district court should credit evidence or testimony that was rejected during the administrative process and remand for an immediate award of benefits where: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Smolen*, 80 F.3d at 1292.

The *Smolen* test does not apply here because there are "outstanding issues that must be resolved before a determination of disability can be made." As stated above, Dr. Caillouette's statement regarding Lingenfelter's disability is ambiguous, and it is exclusively within the province of the ALJ to interpret ambiguous evidence. A remand to the agency is required so that the ALJ may either interpret Dr. Caillouette's statement or hold additional hearings to determine the proper interpretation.

We have generally applied the *Smolen* test only in cases where the evidence in the record strongly supports a finding

of disability. *See, e.g.*, *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (finding that, despite the finding of no disability by the ALJ, the record "clearly establishes that [claimant] cannot perform a sedentary job"); *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002) (stating that the VA rating of disability, which the ALJ did not consider, was supported by several hundred pages of medical records and must be given "great weight"; hence "a finding of disability is clearly required"); *Smolen*, 80 F.3d at 1291-92 (noting that the claimant offered "extensive testimony" that was supported by two physicians' opinions and the rest of the record, and that "the overwhelming evidence . . . required the ALJ to find [claimant] disabled"); *Swenson v. Sullivan*, 876 F.2d 683, 688 (9th Cir. 1989) (finding that the claimant's testimony "was supported by substantial medical evidence," and that the only expert testified that the claimant would not be able to engage in any work). In this case, to the contrary, the weight of the medical evidence in the record contradicts both the degree of Lingenfelter's claimed disability and the medical opinions of Lingenfelter's treating physicians. The *Smolen* test was designed to expedite the resolution of disability applicants' claims, but should not be employed in cases where it would be likely to result in the wrongful award of benefits. *Cf. Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Even if the *Smolen* test were applicable here, our precedents establish that we are not required to use the test in all cases where it applies. Rather, we have discretion in such cases to remand to the agency to make further credibility findings. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003); *see Nguyen v. Chater*, 100 F.3d 1462, 1466-67 (9th Cir. 1996); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (en banc) (affirming the district court decision remanding the case to the agency). In this case, I would remand to the agency for further

credibility findings, given that the weight of the medical evidence contradicts Lingenfelter's claim of complete disability.

## VI

I would reverse the judgment of the district court and remand to the district court with instructions to remand to the Commissioner of the Social Security Administration for further administrative proceedings consistent with this dissent.