Linda J. PETTY, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. CV01–220–PHX–ROS.

United States District Court, D. Arizona.

March 27, 2008.

Eric Glenn Slepian, Slepian Law Office, Phoenix, AZ, for Plaintiff.

Michael R. Arkfeld, Michael A. Johns, U.S. Attorney's Office, Phoenix, AZ, Peter Thompson, SSA Office of The General

Counsel, San Francisco, CA, for Defendant.

## ORDER

ROSLYN O. SILVER, District Judge.

Plaintiff Linda Petty challenges the denial of her application for disability insurance benefits. The parties have filed cross-motions for summary judgment. For the following reasons, Petty's motion for summary judgment will be granted, and the Commissioner of Social Security's will be denied.

## STATEMENT OF FACTS

### I. Background

Petty was born on July 7, 1945. (Tr. 81). Prior to the alleged onset date of her disability, she was a real estate broker. (Tr. 99). She has asserted that she is disabled by a mental impairment, depression, and two physical impairments, left ear neurosensory hearing loss and seasonal allergy use with anaphylaxis.

### II. Mental Impairment

There are no medical records evidencing mental health treatment, symptoms of depression, or complaints to Petty's treating physician about depression from January 2, 1996 to March 31, 1997. (Tr. 22). The first indication of symptoms or treatment for depression was an August 1998 notation by her treating physician that Petty was prescribed Prozac. *Id.*

On September 14, 1998, Dr. Marlene Shiple conducted a consultative psychological evaluation. *Id.* Dr. Shiple diagnosed affective disorder, depressive type, and concluded that the resultant limitations "preclude all work activity." (Tr. 281). She also stated that this condition had existed "at least for the past year." (Tr. 284).

On October 1, 1998, Petty's treating physician noted that Petty was still de-

pressed, and increased the prescribed dosage of Prozac. (Tr. 607). He also referred Petty to Dr. Hollenback for her depression. *Id.* On November 12, 1998, she met with Dr. Hollenback, and he noted that she was depressed. (Tr. 608–09).

On September 23, 1999, Dr. Brent Geary conducted a consultative psychological evaluation of Petty. (Tr. 304–11). Dr. Greary diagnosed dysthymic disorder of late onset, with compounding bereavement and somatic concerns. (Tr. 308). In his narrative, he opined that "[Petty] has been unable to work for three years and this restriction with the resulting loss of productivity is a stressor that causes dysphoria in most people and certainly in this case." *Id.* In his medical source statement, Dr. Greary stated that the earliest date the same level of severity as the day of the exam existed was August 1999. (Tr. 311).

Medical expert Dr. Jack Games testified at Petty's hearing on September 18, 2003. (Tr. 723–739). Dr. Games testified that there was evidence of a medically determinable mental condition currently. (Tr. 723). When asked when Petty's depression began, he replied, "I would agree with Dr. Greary that [Petty's depression] would go back three years from his evaluation of the patient." (Tr. 730). He went on to say that "I think it quite possible the depression would go back that far, but I can't prove that from the evidence." (Tr. 731). He then concluded that "I think I would have to go by the evidence of, you know, the first time Prozac was being prescribed; and I think that brings us to '98." *Id.*

### III. Physical Impairment

#### A. *Hearing Loss*

On January 2, 1996, Petty was treated for sudden hearing loss. (Tr. 168). She was again treated on January 12, 1996, and the physician noted that Petty's hearing in

the left ear was almost gone. (Tr. 160–61). This was confirmed on January 22, 1996, when she was diagnosed with neurosensory hearing loss in her left ear. (Tr. 157). An audiogram also revealed a mild high frequency loss in the right ear. *Id.* On August 7, 2003, Petty was treated for increased hearing loss. (Tr. 708).

B. *Allergies*

Dr. Allan Wachter began treating Petty for her allergies in March 1987. (Tr. 25). On March 19, 1996, Petty saw Dr. Wachter for a follow-up visit. (Tr. 228). Dr. Wachter noted that the immunotherapy was going fairly well. *Id.* He also noted that Petty was having mild breakthrough symptoms. Id. He prescribed Ru–Tuss, Flonase, and instructed her to continue immunotherapy, and discontinued Bromfed. *Id.*

On October 10, 1996, Petty was treated for an allergy flair. (Tr. 164). Dr. Wachter recommended Flonase, Duratuss, Claritin, and immunotherapy. *Id.* He noted that she was clinically stable. *Id.*

On March 17, 1997, Dr. Wachter stated that Petty had a high degree of allergies and was experiencing breakthrough symptoms. (Tr. 163). He gave her a Medrol Dosepak, recommended continuation of immunotherapy, and renewed her epinephrine-pen prescription. *Id.*

On April 9, 1997, Petty went to the emergency room for her allergies, and was diagnosed with allergic conjunctivitis and rhinitis. (Tr. 213). She was given a steroid shot and antihistamines. *Id.*

On April 30, 1997, Petty saw Dr. Wachter. (Tr. 202). He noted that she was having breakthrough symptoms. *Id.*

On May 19, 1997, Dr. Wachter saw Petty for a follow-up visit. (Tr. 201). He noted that "[s]he has a history of very severe and almost life-threatening allergies as well as a history of anaphylaxis." *Id.*

On June 6, 1997, Dr. Wachter authored a letter stating that "Petty has a history of extreme allergies to pollens, asthma, and a history of idiopathic anaphylaxis." (Tr. 162). He noted that Petty was evaluated at Denver National Jewish Hospital and was found to be highly allergic at an extreme level. *Id.* He also wrote that "[d]uring the high pollen seasons she has been bed ridden and/or home bound because of severe allergies and asthma." *Id.* Dr. Wachter opined that the severe allergies and asthma resulted in an inability to maintain employment, and therefore that Petty should qualify for Social Security Disability Benefits." (Tr. 162).

On October 13, 1997, Dr. Wachter stated that Petty has been experiencing increasing problems with allergies. (Tr. 354). He further noted that she was disabled from severe allergies and that during peak allergy season she has to leave Arizona to move to San Diego. (Tr. 356).

On January 6, 1998, Dr. Wachter again wrote a letter stating that Petty suffered from severe allergy symptoms and was a candidate for disability as of January 1996. (Tr. 200).

On June 2, 1998, Dr. Wachter completed a medical assessment of ability to do work-related physical activities. (Tr. 209–10). Therein, Dr. Wachter stated that Petty could sit for four hours, stand for one hour, and walk for one hour in an eight hour workday, occasionally lift and carry up to ten pounds, and occasionally bend, squat, and reach. (Tr. 210). He also stated that she had total restriction from exposure to changes in temperature and humidity, and dust, fumes, and gases. *Id.*

**PROCEDURAL HISTORY**

Petty filed for disability insurance benefits on August 26, 1996, alleging disability since January 2, 1996. (Tr. 81–84). Her date last insured was March 31, 1997. (Tr.

19, 91). Petty alleges impairments including: chronic hay fever, hearing loss, hypertension, headaches, and depression. (Tr. 21, 95). After initial and reconsideration denials, Petty requested an administrative hearing. (Tr. 44–47, 49–52, 53).

On December 15, 1999, Petty appeared with counsel before an Administrative Law Judge ("ALJ"), who considered the claim *de novo*. (Tr. 455–86). In a decision dated March 31, 2000, the ALJ found Petty was not disabled within the meaning of the Social Security Act. (Tr. 411–18).

On February 5, 2001, Petty filed for judicial review. (Doc. 1). The matter was remanded to the Commissioner on June 19, 2001 for the Commissioner to locate missing medical evidence or otherwise reconstruct the record. (Doc. 9; Tr. 19, 436–38).

After the records could not be located in their entirety, the March 31, 2000 decision was vacated, and a second hearing was held on April 4, 2002. (Tr. 487–529). On May 24, 2002, the ALJ issued a decision finding that Petty was not disabled. (Tr. 396–405). On June 17, 2003, the Appeals Council remanded the matter to the ALJ for further action. (Tr. 549–52).

Two hearings were held on remand: September 18, 2003 and September 22, 2003. (Tr. 710–41, 742–71). On November 26, 2003, ALJ Joan G. Knight issued a decision finding that Petty was not disabled within the meaning of the Social Security Act. (Tr. 18–30).

On January 22, 2004, Petty sent, via federal express, exceptions disagreeing with the decision of the ALJ. (Doc. 36). As of February 2008, the Appeals Council had not acted on these exceptions. (*Id.*)

On March 13, 2008, the Appeals Council notified the Court that it either did not receive or had lost Petty's exceptions. (Doc. 40). The same day, Petty withdrew her exceptions. (Doc. 41). To the extent that the Appeals Council was nonetheless required to rule on Petty's exceptions, the Commissioner waived exhaustion. (*Id.*)

On August 17, 2007, Petty filed a motion for summary judgment seeking judicial review of ALJ Knight's decision pursuant to 42 U.S.C. § 405(g). (Doc. 26). Defendant filed a cross-motion for summary judgment on September 22, 2007. (Doc. 30).

### JURISDICTION

■ Because subject-matter jurisdiction is an Article III, as well as statutory, requirement, the Court must consider *sua sponte* whether it has subject-matter jurisdiction. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093 (9th Cir.2004) ("The court has a continuing obligation to assess its own subject-matter jurisdiction, even if the issue is neglected by the parties.").

A claimant may seek judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Once a claimant brings an action under Section 405(g), the Court may remand to the Commissioner pursuant to sentences four or six of this Section. *See Shalala v. Schaefer*, 509 U.S. 292, 296, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993); *Hoa Hong Van v. Barnhart*, 483 F.3d 600, 605 (9th Cir.2007). On June 22, 2001, the instant case was remanded to the Commissioner for further administrative action pursuant to sentence 6 of 42 U.S.C. § 405(g).[1] (Doc. 9).

---

1. Sentence six of § 405(g) provides in its entirety: "The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only

■ "[W]hen a case is remanded by a federal court, the decision of the administrative law judge will become the final decision of the Commissioner ... unless the Appeals Council assumes jurisdiction of the case." 20 C.F.R. § 404.984(a). The Appeals Council may assume jurisdiction if the claimant files exceptions disagreeing with the decision of the ALJ or on its own motion. 20 C.F.R. §§ 404.984(b), (c). If the claimant files exceptions, the ALJ's decision does not become the final decision until the Appeals Council responds to the claimant's request for review. *Widman v. Comm'r of Social Sec. Admin.*, 230 Fed. Appx. 708, ——, 2007 WL 1231597, at * 1 (9th Cir.2007); *Selvey v. Astrue*, No. 1:06cv0594, 2007 WL 1456145, at *4 (E.D.Cal. May 16, 2007).

■ Because Petty has withdrawn her exceptions and the Appeals Council has not assumed jurisdiction on its own motion, the ALJ's decision denying Petty's request for benefits constitutes a final decision for purposes of Section 405(g) jurisdiction. *See* 20 C.F.R. § 404.984.

■ In the alternative, even if the Appeals Council automatically assumed jurisdiction by virtue of Petty filing exceptions despite the fact that these exceptions were subsequently lost or not received, the ALJ's decision denying Petty's request for benefits still constitutes a judicially reviewable final decision because the Commissioner has waived the exhaustion requirement. The power to so do is clearly established. *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 47 L.Ed.2d 18

(1976) ("[T]he power to determine when finality has occurred ordinarily rests with the [Commissioner] since ultimate responsibility for the integrity of the administrative program is his."); *Queen of Angels/Hollywood Presbyterian Med. Ctr. v. Shalala*, 65 F.3d 1472, 1482 & n. 26 (9th Cir.1995) (collecting cases).

Therefore, the Court has subject-matter jurisdiction.

## STANDARD OF REVIEW

"The Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir.2007). " 'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Orn*, 495 F.3d at 630 (internal quotations omitted); *see also Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir.2007).

## ANALYSIS

### I. Evaluation Process

There is a five-step process for determining if a person is "disabled" for purpose of receiving disability benefits:

(1) whether the claimant is presently engaging in substantially gainful activi-

---

upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and

shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based."

ty; (2) whether the claimant has a severe impairment; (3) whether the impairment is listed, or equivalent to an impairment listed, in Appendix I of the regulations; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantially gainful activity.

*Parra v. Astrue,* 481 F.3d 742, 746 (9th Cir.2007); *see also* 20 CFR § 404.1520; *Hoopai v. Astrue,* 499 F.3d 1071, 1074 (9th Cir.2007).

The burden of proof is on the claimant to establish steps one through four. *Parra,* 481 F.3d at 746; *Ukolov v. Barnhart,* 420 F.3d 1002, 1004 (9th Cir.2005). At the fifth step, the burden of proof shifts to the Commissioner to demonstrate that there are a significant number of jobs in the national economy that claimant can perform. *Parra,* 481 F.3d at 746; *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir.2005).

## II. Step One

The ALJ began the disability inquiry with step one: whether Petty has engaged in substantial gainful activity since her alleged disability onset date of July 2, 1996. *See* 20 CFR § 404.1520(a)(4)(i). The Parties agree the ALJ properly determined that Petty did not perform substantial gainful activity during the relevant time period.

## III. Step Two

Pursuant to step two of the disability inquiry, the ALJ had to consider "the medical severity" of Petty's conditions. 20 CFR § 404.1520(a)(4)(ii). Because Petty must establish that she became disabled on or before the expiration of her insured status, she must demonstrate that each condition was severe on or before March 31, 1997. *See* 20 C.F.R. § 404.315.

The ALJ found that seasonal allergy use with anaphylaxis and left ear neurosensory hearing loss satisfied step two, but rejected that Petty's depression was severe prior to March 31, 1997. There is no dispute that Petty currently suffers from depression, but rather the issue is whether its onset was prior to March 31, 1997.

■ To establish the impairment of depression, Petty was required to produce "medical evidence consisting of signs, symptoms, and laboratory findings, not only [a] statement of symptoms." 20 C.F.R. § 404.1508. The ALJ committed legal error by requiring that this evidence be contemporaneous or at least within one year of Petty's date of last insured. (*See* Tr. 23). Although contemporaneous medical evidence is preferred, a claimant may offer retrospective diagnoses that relate back to the insured period to show disability. *See, e.g., Morgan v. Comm'r,* 169 F.3d 595, 601 (9th Cir.1999); *Lester v. Chater,* 81 F.3d 821, 832 (9th Cir.1995); *Flaten v. Sec'y of Health & Human Servs.,* 44 F.3d 1453, 1461 & n. 5 (9th Cir.1995); *Smith v. Bowen,* 849 F.2d 1222, 1225 (9th Cir.1988); *Bilby v. Schweiker,* 762 F.2d 716, 719 (9th Cir.1985).

■ In addition, the ALJ committed error by "plac[ing] significant weight" on Dr. Games' testimony without addressing its inconsistency. Dr. Games, the medical expert who testified at the hearing, stated that "I would agree with Dr. Geary that [Petty's depression] would go back three years from his evaluation of the patient." When pressed, however, Dr. Games stated that it began in August 1998. While "an ALJ need not agree with everything said by an expert witness to find that his testimony constitutes substantial evidence regarding disability," she "must reject, or specify reasons for accepting, any significantly inconsistent testimony." *Swenson v. Sullivan,* 876 F.2d 683, 688 (9th Cir.

1989). The ALJ thus erred by not rejecting or specifying reasons for accepting Dr. Games' inconsistent testimony regarding the onset date of Petty's depression.

■ Finally, the ALJ found Dr. Geary's opinion not credible—despite the fact that Dr. Games, upon whose opinion the ALJ "place[d] significant weight," relied upon it. To support her finding that Dr. Geary was not credible, the ALJ noted that Dr. Geary's narrative conflicted with his medical source statement. To the extent that his report was ambiguous or inconsistent, the ALJ is required to recontact Dr. Wachter. 20 C.F.R. §§ 404.1512(e); 416.912(e); *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005); *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir.2002); *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir.2001).

■ The ALJ also found that Dr. Geary's opinion was not entitled to any weight because his examination occurred more than one year after Petty's date of last insured and could not be related back. As discussed above, this is legal error. *See, e.g., Lester,* 81 F.3d at 832 ("This court has specifically held that 'medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition.'" quoting (*Bowen,* 849 F.2d at 1225)). Moreover, as the Ninth Circuit has noted, "depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness." *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir.1996). Therefore, "the fact that [Petty] may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that Dr. [Geary]'s assessment of claimant's condition is inaccurate." *Id.*

Thus, the ALJ committed legal error at step two.

## IV. Step Three

At step three, the ALJ must determine whether Petty's impairments are listed in Appendix I of the regulations. 20 CFR § 404.1520(a)(4)(iii). The ALJ found that Petty's impairments did not meet or equal the impairments listed in Appendix I, and the Parties agree that this finding was correct.

## V. Residual Functional Capacity Assessment

Before proceeding to the fourth step, the ALJ must assess Petty's residual functional capacity ("RFC"), which is defined as what the claimant can do despite her limitations. *See* 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1). Petty asserts that the ALJ improperly discredited her treating physician's opinion and her symptom testimony.

### A. *Treating Physician's Opinion*

■ Petty claims that the ALJ improperly rejected the opinion of Dr. Wachter, her treating physician, when conducting the RFC assessment. The ALJ must accord special weight to a treating physician's opinion because he has a "greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989). If the treating physician's opinion is uncontroverted, it may be rejected only for clear and convincing reasons. *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir.1998); *Baxter v. Sullivan,* 923 F.2d 1391, 1396 (9th Cir.1991). If it is contradicted by the opinion of another doctor, the treating physician's opinion may only be rejected if the ALJ provides specific and legitimate reasons supported by substantial evidence in the record for so doing. *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir.2001); *Reddick,* 157 at 725.

■ The ALJ did not provide clear and convincing reasons for rejecting the uncontroverted opinion of Dr. Wachter. First, the ALJ found that Dr. Wachter's medical files did not describe Petty's allergies as severe until after she told him that she was filing for disability. (Tr. 27). On this basis, the ALJ found that "Dr. Wachter is sympathetic to the claimant and is trying to help her obtain disability." *Id.* While the Court agrees that the timing may suggest cause for suspicion, there is nothing remarkable about the fact that a doctor advocates his patient's cause. *See McGoffin v. Barnhart,* 288 F.3d 1248, 1253 (10th Cir.2002) ("[A]n ALJ's assertion that a family doctor naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician.").

■ Second, the ALJ found that "[d]uring the time period relevant to this decision, the claimant had no emergent exacerbations of her allergy symptoms." (Tr. 27). As discussed above, although contemporaneous medical evidence is preferred, retrospective diagnoses that relate back to the insured period to show disability are acceptable. *See, e.g., Morgan v. Comm'r,* 169 F.3d 595, 601 (9th Cir.1999). And, indeed, on April 9, 1997—just 9 days after her last insured date—Petty went to the emergency room for her allergies where she was given a steroid shot. (Tr. 213).

■ Third, the ALJ found Dr. Wachter's contemporaneous notes, which show the claimant's allergies to be clinically stable since January 1996, contradicted his opinion that Petty suffered from disabling allergy symptoms. The Court initially notes that a condition can be stable but disabling. But, to the extent that his report was ambiguous or inconsistent, the ALJ is required to recontact Dr. Geary. 20 C.F.R. § § 404.1512(e); 416.912(e); *Webb v. Barnhart,* 433 F.3d 683, 687 (9th

Cir.2005); *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir.2002).

■ Third, the ALJ rejected Dr. Wachter's medical source statements of Petty's ability to do work-related activities because there was no evidence to support Dr. Wachter's opinion that Petty can only sit for 4 hours out of an 8–hour workday. (*See* Tr. 27). A finding that a medical opinion is not supported by enough objective findings alone, however, does not constitute a clear and convincing reason for rejecting its conclusion. *Rodriguez v. Bowen,* 876 F.2d 759, 762 (9th Cir.1989) ("While objective diagnoses and observations are the most important parts of a physician's reports, neither the ALJ's observation of the claimant nor his reliance on the inability of the physicians to support their findings with objective laboratory findings constitutes a clear and convincing reason for rejecting their conclusions." (internal quotations omitted)); *Embrey v. Bowen,* 849 F.2d 418, 421 (9th Cir.1988) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim."). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir.1998).

■ Moreover, the ALJ stated that "there is no evidence of any spinal pathology or other impairment to limit her ability to sit." (Tr. 27). While correct, this statement does not merit rejection of Dr. Wachter's opinion. *See Orn v. Astrue,* 495 F.3d 625, 634 (9th Cir.2007). Dr. Wachter never claimed that spinal pathology or another impairment limited Petty's ability to

sit. Rather, Dr. Wachter asserted that Petty's ability to work was limited by her allergies. *See id.* (ALJ erred by rejecting treating physicians assessment of claimants limitations for lack of evidence of "decreased range of motion or neurological deficits" when the claimant's ability to work was limited by respiratory conditions).

■■■ Finally, "[i]f the ALJ thought he needed to know the basis of Dr. [Wachter]'s opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them." *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir.1996). Having failed to fully develop the record regarding the basis for Dr. Wachter's opinions, the ALJ could not then reject those uncontroverted opinions. *See id.*

Thus, the ALJ improperly discredited Dr. Wachter's testimony.

### B. *Petty's Symptom Testimony*

Petty also argues that the ALJ erred in discrediting her testimony. "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035–36 (9th Cir.2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal quotations omitted). "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal quotations omitted).

The Parties agree that Petty met the requirement at step one by providing evidence of her allergies that could reasonably be expected to produce some degree of the pain and symptoms alleged. At step two, the ALJ did not find evidence of malingering, but nonetheless found that Petty's testimony was only partially credible.

■■■■ The ALJ did not provide clear and convincing reasons for this adverse credibility finding. First, the ALJ found that "there was no evidence of exacerbations of her allergies during the relevant period." (Tr. 26). But "the [ALJ] may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick,* 157 F.3d at 722; *see also Lingenfelter,* 504 F.3d at 1036 ("[T]he ALJ may not reject subjective symptom testimony ... simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." (quoting *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Cir.1996)) (emphasis in original)). Moreover, Petty was experiencing breakthrough symptoms. (*See* Tr. 163, 164, 228).

■■■ Second, the ALJ relied upon incorrect facts. Specifically, she found that "there is no evidence of any exacerbations requiring emergency physician intervention or hospitalization since 1991." (Tr. 26). This is incorrect. On April 9, 1997— just 9 days after her last insured date— Petty had to go to the emergency room for her allergies where she was given a steroid shot. (Tr. 213). The ALJ also found that Petty "uses only Claritin and Benadryl, which are both available without prescription." (Tr. 26). This also is incorrect. During the relevant period, Petty took immunotherapy, pseudoephedrine, Ru–Tuss, Flonase, Bromfed, Duratuss, Alomide, Proventil, Medrol Dosepak, and had a prescription for an epinephrine pen. (Tr. 163, 164, 228).

Fourth, the ALJ found that Petty "was not homebound" and that "she does go out and even makes trips out of state." (Tr. 26). But the Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from her credibility as to her over-all disability." *Orn*, 495 F.3d at 639 (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir.2001)). Rather, the ALJ must make specific findings relating to Petty's activities and their transferability to a work setting to conclude that they warrant an adverse credibility determination. *See id*. Moreover, when she did travel out-of-state, it was to obtain relief from her allergy symptoms. (*See* Tr. 150, 356). This, if anything, supports Petty's assertion of an inability to sustain work in her home state of Arizona.

Thus, the ALJ improperly discredited Petty's testimony as to her seasonal allergies.[2]

\* \* \*

Because the ALJ did not provide clear and convincing reasons for discrediting Dr. Wachter and Petty's testimony from his assessment of Petty's RFC, substantial evidence does not support the assessment. *See Lingenfelter*, 504 F.3d at 1040.

## VI. Step Four

Under step four, the ALJ must determine whether Petty could perform the requirements of her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ found, and the Parties agree, that Petty's impairments precluded her from performing her past work as a real estate worker. Thus, no error is alleged at step four.

## VII. Step Five

The fifth step requires the ALJ to determine whether Petty retained the RFC to perform work in the national economy consistent with her age, education, and work experience. *See* 20 C.F.R. § § 404.1520(a)(4), 416.920(a)(4). Substantial evidence does not support the ALJ's step-five determination since it was based on an erroneous RFC assessment. *See Lingenfelter*, 504 F.3d at 1035.

## VIII. Remedy

The Court must credit evidence rejected during the administrative process and remand for an immediate award of benefits if:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir.2004).

Because the ALJ failed to provide legally sufficient reasons for rejecting Petty's testimony and the opinions of Drs. Geary and Wachter, the Court credits this evidence as true. *See id*.

The Court cannot remand for award of benefits, though, because two outstanding issues must be resolved on remand.

First, to be eligible for benefits, Petty must have been disabled on or before her last insured date, March 31, 1997. *See* 20 C.F.R. § 404.315. It is unclear on the record whether, even crediting Dr. Geary's

---

**2.** The ALJ also rejected Petty's testimony as to personal care products. (*See* Tr. 26). The ALJ correctly determined that she did not have to credit this testimony because there was no objective medical evidence of this impairment. *See Lingenfelter*, 504 F.3d at 1036.

opinion, Petty was depressed prior to this date. Therefore, the ALJ should re-examine his finding that Petty's depression began in August 1998, while treating Dr. Wachter's opinions as credible. To do so, it may be necessary to develop the record further. "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001).

Second, it is not clear whether, crediting Petty's testimony and Dr. Wachter's opinions as true, the vocational expert's testimony establishes that Petty cannot work. The ALJ should develop the record on this point on remand. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) ("The ALJ ... has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered.") (internal quotation and citation omitted).

Accordingly,

**IT IS ORDERED** that Petty's Motion for Summary Judgment (Doc. 26) is **GRANTED.**

**IT IS ORDERED** that the Commissioner's Motion for Summary Judgment (Doc. 30) is **DENIED.**

**IT IS FURTHER ORDERED** that this case is remanded to the Commission pursuant to sentence 4 of 42 U.S.C. § 405(g) for further administrative action. On remand, the Commission shall reevaluate Petty's claim for benefits in accordance with this decision.

**IT IS FURTHER ORDERED** that this case shall be closed.