**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIVIAN R. TREVIZO,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner Social Security,<br>*Defendant-Appellee*. | No. 15-16277<br><br>D.C. No.<br>2:14-cv-00616-<br>SRB<br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted May 16, 2017
San Francisco, California

Filed July 10, 2017
Amended September 14, 2017

Before: Sidney R. Thomas, Chief Judge, Kim McLane
Wardlaw, Circuit Judge, and Brian M. Morris,[*]
District Judge.

Order;
Opinion by Judge Wardlaw

---

[*] The Honorable Brian M. Morris, United States District Judge for the District of Montana, sitting by designation.

## SUMMARY[**]

### Social Security

The panel reversed the district court's order affirming the denial of disability benefits by the Commissioner of the Social Security Administration, and remanded with instructions to remand to the administrative law judge ("ALJ") for the calculation and award of benefits.

The panel held that the ALJ did not follow the appropriate methodology for weighting a treating physician's opinion, and there was no legitimate stated reason for rejecting the treating physician's opinion. The panel concluded that the ALJ should have credited the treating physician's opinion and found that claimant was disabled. The panel further held that the district court erred by developing its own reasons to discount the treating physician's opinion, rather than reviewing the ALJ's reasons for substantial evidence.

The panel held that the ALJ erred in discounting the claimant's testimony regarding her subjective symptoms. The panel held that the vast majority of the ALJ's bases for rejecting claimant's testimony were legally or factually erroneous; and substantial evidence did not support a finding that claimant's symptoms were not as severe as she testified, particularly in light of the extensive medical record objectively verifying her claims.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that each of the "credit-as-true" factors outlined in *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014), was satisfied, and therefore remand for the calculation and award of benefits was warranted.

## COUNSEL

Mark Caldwell (argued), Mark Caldwell P.C., Phoenix, Arizona, for Plaintiff-Appellant.

Jeffrey E. Staples (argued) and Lisa Goldoftas, Assistant Regional Counsel; Mathew W. Pile, Acting Regional Chief Counsel, Seattle Region X; Elizabeth A. Strange, Acting United States Attorney; Office of the General Counsel, Social Security Administration, Seattle, Washington; for Defendant-Appellee.

## ORDER

The opinion filed on July 10, 2017 is amended, and an amended opinion is filed. With these amendments, we deny Defendant-Appellee's petition for panel rehearing. No future petitions for rehearing or petitions for rehearing en banc will be entertained. The mandate shall issue forthwith.

**IT IS SO ORDERED.**

**OPINION**

WARDLAW, Circuit Judge:

Vivian Trevizo ("Trevizo"), a 65-year-old woman last employed as a security guard nine years ago, in 2008, appeals the district court's order affirming the denial of disability benefits by the Commissioner of the Social Security Administration. Trevizo argues that the administrative law judge ("ALJ") improperly rejected the medical opinion of her treating physician and erroneously discounted her symptom testimony. We reverse the judgment below with instructions to remand to the ALJ for the calculation and award of benefits.

**I.**

*A.  Procedural history.*

Trevizo applied for disability benefits on April 8, 2010, claiming a disability onset date of August 15, 2008. On June 24, 2010, Trevizo's claim was denied. On reconsideration on October 29, 2010, however, the agency found that Trevizo met "the medical requirements for disability benefits" as of September 16, 2010. Trevizo requested a hearing before an ALJ to challenge the onset date in the partially favorable decision. At the hearing, held on August 23, 2012, Trevizo presented extensive medical records to support her claimed impairments and testified at length about how those impairments affect her daily activities and limit her ability to perform work. The ALJ found that Trevizo was not disabled and denied the claim in its entirety on September 27, 2012. On January 28, 2014, the Appeals Council denied Trevizo's agency appeal, and Trevizo sought judicial review of the

agency's decision in the district court for the District of Arizona. On May 13, 2015, the district court affirmed the ALJ's decision. Trevizo timely appealed.

*B. Personal and medical history.*

The administrative record and the evidence presented at the hearing comprehensively address Trevizo's physical health and impairments. Trevizo suffers from uncontrolled Type II diabetes, psoriasis, hypertension, high cholesterol, chronic lumbago, invertebral disc degeneration, psoriatic arthritis, and mild scoliosis. Since 2008 she has also experienced migraines, Achilles tendinitis, heel and Achilles bone spurs, vaginitis, urinary tract infections, pelvic inflammatory disease, fatigue, weakness, and several bouts of conjunctivitis. Her past surgeries include carpal tunnel surgery on both wrists, a hysterectomy, gallbladder removal, an appendectomy, partial intestinal surgery, and a colonoscopy in which a large polyp was removed. In March 2012, Trevizo was admitted to the emergency department complaining of chest pain, and she was released upon treatment. Throughout this period Trevizo has been severely or morbidly obese.

1. Treating providers.

Dr. Ravi Galhotra is Trevizo's primary care physician. The record reflects that Trevizo had at least 22 medical visits with Dr. Galhotra between January 2008 and August 2012. Trevizo has consulted Dr. Galhotra extensively for her psoriasis and accompanying back and joint pain, as well as for treatment of cold and sinus symptoms, ear infections, conjunctivitis, migraines and headaches, weakness, fatigue, yeast infections, urinary tract infections, chest pain, and other

ailments. The first mention of a skin condition in Trevizo's medical records was on January 2, 2009, when she visited Dr. Galhotra complaining of a rash. The doctor reported "[m]ultiple skin abscesses on various parts of her body" in his treatment notes. On January 20, 2009, Dr. Galhotra again evaluated the rash, noting that Trevizo was not compliant with her diabetes medication because she feared it was causing the rash and related itching. By January 29, 2009, the treatment notes reflect a "[r]ash throughout her body particularly on the scalp" and contain the first explicit mention of psoriasis. Trevizo visited Dr. Galhotra for flare-ups of her psoriasis over the next few years, while also consulting with dermatologists. During this time, Trevizo visited Dr. Galhotra regularly for pain as well. Dr. Galhotra's notes reflect that Trevizo complained of lower back pain as early as May 1, 2008, and that at most of her subsequent appointments she had lower back pain and pain in her other joints, particularly her elbows and ankles. On November 6, 2009, Dr. Galhotra reported positive straight-leg raising tests and the inability to stand on her toes and heels. The notes reflect that Dr. Galhotra prescribed Vicodin and Tramadol hydrochloride for Trevizo's disc degeneration, and consistently counseled her about weight loss, exercise, and diet.

Dr. Galhotra completed a check-the-box medical assessment of Trevizo's ability to do work-related physical activities. He wrote that she suffered from diabetes, disc degeneration, hypertension, and psoriasis. Dr. Galhotra also wrote that Trevizo could both occasionally and frequently lift 20 pounds; could stand and/or walk for less than two hours in an eight-hour workday, which he noted was "b'cause [sic] of back pain"; and could sit with normal breaks for up to three hours per day. He further noted that her symptoms would

require her to alternate sitting and standing four or five times per eight-hour shift. He noted that she could never kneel or crawl and could occasionally climb, stoop, balance, or crouch. Dr. Galhotra concluded that, because of her carpal tunnel surgery, Trevizo could only occasionally use her hands for simple grasping, gross and fine manipulation, and reaching. He cautioned that Trevizo should limit exposure to heights, moving machinery, temperature extremes, and chemicals. He did not provide additional comments to explain his assessment.

Following Trevizo's appointment with Dr. Galhotra during which he first found "skin abscesses," Trevizo consulted Dr. Lisa Hynes, a dermatologist. Dr. Hynes tried several treatments with Trevizo, none of which was successful. At the first appointment on February 3, 2009, Trevizo stated that she had experienced a rash for about one month (a statement consistent with her January 2, 2009 appointment with Dr. Galhotra) and went to the emergency department when the rash appeared. On February 9, 2009, Dr. Hynes reported that the psoriasis had spread to 25 percent of Trevizo's body surface area ("BSA"). Dr. Hynes started Trevizo on "systemic" treatment "[d]ue to extent of disease." At a February 23, 2009 appointment, the notes indicate "no improvement" in the psoriasis, which "continue[d] to spread." March 23, 2009 was Trevizo's final appointment with Dr. Hynes; she reported some improvement but "still significant breaking out" and nausea related to the medication. Dr. Hynes noted that 35 percent of Trevizo's BSA was covered with psoriasis and started Trevizo on Humira injections.

After ending treatment with Dr. Hynes, Trevizo turned to Dr. Lindsay Ackerman, who is her primary treating dermatologist and who has been responsible for most of the

care related to her psoriasis. Trevizo had at least 22 medical visits with Dr. Ackerman between February 2010 and June 2012. Trevizo first visited Dr. Ackerman on February 23, 2010. Dr. Ackerman reported that Trevizo had developed psoriasis "one year ago" and that to treat it Trevizo had taken cyclosporine, which she discontinued for fear of exacerbating her kidney disease, and Humira, which she took for six months and discontinued upon losing her insurance. Dr. Ackerman's treatment notes reveal that Trevizo's BSA coverage ranged from 6 percent in February 2010 to a high of nearly 90 percent following a severe flare-up in July 2010. Dr. Ackerman tried numerous treatment options with Trevizo—including topical treatments, cyclosporine, Humira, Remicade, Enbrel, methotrexate, and Stelara—most of which resulted in some initial improvement followed by an ultimate failure of treatment. Dr. Ackerman eventually wrote that Trevizo was "notable" for having failed so many different treatments. Dr. Ackerman noted that Trevizo suffered from regular flare-ups, joint pain, itchiness (and related difficulty sleeping), foul smells from the plaques (requiring showering three or four times daily), and fatigue.

On April 2, 2012, Dr. Ackerman wrote that Trevizo had been hospitalized with severe elbow pain and that the hospitalization "revealed . . . arthritis that was associated with her psoriasis." Trevizo was prescribed oxycodone, which she did not take "as she was fearful of becoming narcotic addicted. Instead she took hydroxyzine which she says kept her pain under control."

2. Examining physician.

Dr. Charles House is a psychologist who evaluated Trevizo for the agency on September 16, 2010. He observed

that she "presented as being an obese woman whose energy level was low" and that she "tended to sit with her head resting on her hand for much of the time." He described her social and language skills as "not very well developed" and said she was "not very aware and was not very attentive." He described her as appearing to have "borderline intellectual functioning." During questioning by Dr. House, Trevizo did not respond when asked who was president during the Civil War; did not understand the question when asked what the proverb "strike while the iron is hot" meant; incorrectly added four plus nine; did not understand the question when asked to count backwards from 70 by sevens; and could not spell the word "world" backwards. Dr. House noted that he skipped a task "as [he] was unable to get this woman to attend to and follow directions." Trevizo told Dr. House that "her main problem was that her feet hurt" because of her psoriasis and that her diabetes also made her "tired and moody."

There was uncertainty about Trevizo's educational background during her evaluation with Dr. House. Trevizo told Dr. House she was placed in a special education class in high school without her mother's knowledge; the psychologist wrote, "This seems unlikely as the parents would have had to have given consent to the school for her to be evaluated, and would then have to give approval for the child to take part in special ed." Dr. House added, "I tried to clarify the matter, but had difficulty doing so. . . . Perhaps she was assigned to some sort of remedial class [for one] year." Dr. House also reported that Trevizo's responses about her reason for leaving her job were "confusing." "She seemed to indicate that she left that job because she was having problems with psoriasis. . . . I initially heard her to say, 'They wanted to remove me from this job.' She then seemed to indicate that she was the one that wanted a different job

because she was allegedly being harassed by truck drivers. She seemed to indicate that she quit this job."

In summary, Dr. House wrote that Trevizo "displayed problems with attention and awareness," "seem[ed] to have some problems with insight," and "lacked normal social skills." He said her "presentation was suggestive of borderline intellectual functioning."

3.  Non-examining physicians.

Dr. Robert Quinones reviewed Trevizo's records for the agency and completed a Residual Functional Capacity ("RFC") assessment. He opined that Trevizo could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for six hours in an eight-hour workday, sit for six hours in day, and push or pull an unlimited amount. He concluded that Trevizo was not disabled because, despite experiencing "some discomfort" from her conditions, she was not "significantly restricted in [her] ability to get about and perform ordinary daily activities."

After Trevizo sought reconsideration of the initial denial of benefits, Dr. Jonathan Zuess completed an RFC assessment for the agency. Dr. Zuess noted that the psoriasis had worsened since Trevizo's initial application; that Trevizo was having increased difficulty walking, sitting, standing, and being exposed to heat; and that she was suffering from depression. Dr. Zuess declined further testing of Trevizo's intellectual functioning, despite Dr. House's provisional borderline intellectual functioning diagnosis, because intellectual limitations were "already ruled out by her work history and [activities of daily living]." After reviewing Dr.

House's evaluation, Dr. Zuess concluded that she "has the basic mental functional capacities necessary to perform simple work." Dr. Zuess also opined that Trevizo could perform only physically "light" work. Finally, Dr. Zuess concluded Trevizo was disabled based on the combination of her physical and mental limitations. Because there was no evidence in the record of her intellectual limitations prior to Dr. House's examination, Dr. Zuess set the onset date as the date of that evaluation, September 16, 2010.

    4.  Self-reporting and third-party evidence.

    In an Exertional Daily Activities Questionnaire, Trevizo reported that in an average day she would "[s]tay home, clean, take my medications." In response to a question about how her symptoms interfered with a normal day, she wrote that her psoriasis was "all over my body and very noticeable has me itchy all day I'm scratching my body. My sores start to bleed people look at me . . . . It causes me pain on my head when sores open. Its [sic] all over my head and face. I get very dizzy and have my diabetes and insulin shots." She added that she could walk "maybe . . . 30 min" with breaks. Trevizo wrote that she was able to lift 15 pounds; that she did "light house work" but could not be on her feet for more than 15 minutes because of pain from her sores and dizziness from her diabetes; that her symptoms, including shortness of breath and lightheadedness, caused her to struggle to complete chores and leave them "halfway done"; that she got five hours of sleep at most per night; that she required rest periods and naps during the day; that she avoided the sun because it hurt her sores; and that before her illness she could do chores.

    Trevizo also filled out a Function Report. When asked to describe a typical day from beginning to end, Trevizo wrote,

"I get me and my kids ready for the day. Every thing I do; never gets finished; because I get really exausted [sic]." She reported that her childcare responsibilities required feeding and bathing the children. She repeatedly described her daily chores as never being completed because of fatigue.

In a Work History Report, Trevizo said that as a security guard her job was to "[j]ust sit in my car and make sure no one was on the site" and that she would walk, stand, and sit "off and on for 8 hours." She used her hands for holding a notebook and writing reports. The security guard job "did not require[] any lifting at all."

Trevizo's granddaughter Virginia Trevizo ("Virginia") filled out a Third-Party Function Report. Virginia wrote that she spent "day and night" with Trevizo, "help[ing] her alot [sic]." Virginia reported that her grandmother's tasks did not get completed without her help; that her family would "watch the kids for [Trevizo] when she is sick"; that before her illness Trevizo was able to dance, run, play sports, and decorate; that because of her illness Trevizo did not "get sleep at all"; that Trevizo's primary chores, cleaning and laundry, "never [got] finished" because of her illness; and that Trevizo did not do house or yard work because "she will probably be [exhausted] or sick."

## C.  ALJ hearing.

At the hearing before the ALJ, Trevizo testified that she left her job as a security guard in 2008 because she "started breaking out" and her diabetes was uncontrolled despite taking insulin. She testified that she had previously worked as a cashier but was unable to continue after she received carpal tunnel surgery and that she experienced "tingling" in

her hands when she used them to pick up items and do chores. When asked why she was unable to work, Trevizo responded, "Because of the itchiness and I get a lot of muscle spasm in my legs. And it just burns . . . ." She explained that the treatments for her psoriasis were not working, including Dr. Ackerman's latest treatment, Stelara. Trevizo reported that when she was doing household chores she periodically experienced difficulty concentrating because of pain and itchiness and that her husband would have to take over the task so she could shower to relieve her symptoms. She testified that she showered at least three times per day to address the itching and the odor caused by her psoriasis plaques. Trevizo explained that she had to wear loose-fitting clothing to be comfortable during flare-ups. When asked about limitations on sitting, Trevizo said, "[R]ight now, because I don't have my sore on my buttocks, I could sit for a while then I go and take me a shower because of the itches." She said that her hands periodically got tingly and numb and that she got headaches, which she initially attributed to her blood pressure before clarifying, "I don't know why I get these headaches." She attributed several issues to her diabetes, stating that her doctor had told her that diabetes caused her "muscle spasms" and made her tired and dizzy. She said that when she had worked as a security guard she had "run[] around the buildings" but now could neither run at all nor walk a mile.

Trevizo testified that her 18-year-old grandson helped her with housework and that she lived with her husband, grandson, and two adopted children, a 7 year old (fostered in 2005 and adopted in 2010) and a 3 year old (fostered in or before 2009 and adopted in 2011). She agreed that her doctor had provided a note verifying that she was medically able to care for the children, although the record is unclear as to

when that note was provided.  Trevizo explained that she was presently fostering a 2 year old, who had been in her home for a year, and had fostered other young children in the past. She testified that when she received notices from the foster care review board, she would call into those hearings or sometimes attend in person.  She had also gone to the dependency court and severance hearings for the children she had adopted and met with their caseworkers.  When asked what "kind of care" the 2-year-old foster child required, Trevizo responded, "He's normal, he doesn't have no problems" and said that he did not go to "counsel."  She testified that the adopted children also had no special needs.

The vocational expert ("VE") addressed hypotheticals put to her by the ALJ.  The ALJ asked about a hypothetical claimant who could occasionally lift or carry 50 pounds, frequently lift 25 pounds, sit for six to eight hours in an eight-hour workday, stand or walk for six to eight hours, and frequently use her hands for fine and gross manipulation. The VE testified that such a claimant would be able to work as a security guard or a foster parent.  The ALJ posed further hypotheticals, including about a claimant who could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, sit for six to eight hours, stand or walk for six to eight hours, and frequently use her hands for fine and gross manipulation (who the VE testified could work as a security guard); a similar claimant who could stand or walk less than two hours (who the VE testified could do only sedentary work); and a claimant who required up to three breaks per day to shower (who the VE testified could not do any work). Finally, the ALJ described a claimant with the limitations outlined in Dr. Galhotra's opinion, and the VE testified that there was no available work for such a claimant because the

total work time permitted by the claimant's limitations was less than full time.

## D.  ALJ decision.

The ALJ followed the five-step sequential evaluation process for determining whether an individual is disabled.  At the first step, she found Trevizo was not engaged in "substantial gainful activity," which would disqualify her from receiving benefits.  At the second step, the ALJ concluded that Trevizo's diabetes and "psoriasis arthropathy"[1] constituted severe impairments, and that Trevizo's hypertension, obesity, high cholesterol, migraines, colon polyp, diverticulitis, lumbago, ankle pain, and intellectual impairment were nonsevere.  At step three, the ALJ found that Trevizo did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Between steps three and four, the ALJ found Trevizo had the RFC to perform medium work, meaning that she could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, sit for six to eight hours per eight-hour workday, stand or walk for six to eight hours, and frequently use her upper extremities for fine and gross manipulation.  *See* 20 C.F.R. § 404.1567(c).  The ALJ found that Trevizo's

---

[1] The ALJ referred to Trevizo's "psoriasis arthropathy" as one of two severe impairments, but that section of the ALJ's decision is about *psoriasis*.  The ALJ did not distinguish psoriasis—a skin condition resulting in red, patchy plaques—from psoriatic arthritis or arthropathy, an arthritis associated with psoriasis that causes joint pain, stiffness, and swelling.  Trevizo has both disorders.

claims about the severity of her diabetes and arthritis were not supported by the medical treatment notes and that her statements were inconsistent. The ALJ rejected the medical opinions of treating physician Dr. Galhotra and non-examining physician Dr. Zuess; she gave "some weight" to the opinion of non-examining physician Dr. Quinones, though she discounted it because she thought it unlikely that Dr. Quinones was aware of Trevizo's childcare activities; and she gave "significant weight" to the opinion of examining physician Dr. House and his conclusion that Trevizo "showed signs of borderline intellectual functioning" but not anxiety or depression. At step four, the ALJ determined that Trevizo was able to perform her past relevant work as a security guard. As a result, the ALJ concluded that Trevizo had not been under a disability between August 15, 2008 and the date of the decision. Accordingly, the ALJ denied benefits.

## II.

We review de novo a district court's order affirming a denial of Social Security benefits by the Commissioner. *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). We set aside a denial of Social Security benefits only when the ALJ decision is "based on legal error or not supported by substantial evidence in the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003). "Substantial evidence means more than a mere scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citations omitted) (internal quotation marks omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir.

2007) (internal quotation marks omitted).  Yet we "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)).  "We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Id.* at 1010; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## III.

The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."   20 C.F.R. § 404.1527(c)(2).  When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician.  *Id.* § 404.1527(c)(2)–(6).

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)).  "If a treating or examining

doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

As the ALJ noted, Dr. Galhotra is Trevizo's "primary treating physician," having treated her at least 22 times between 2008 and 2012. In her one-paragraph discussion of Dr. Galhotra's medical opinion, however, the ALJ afforded "little weight" to his conclusion that Trevizo "could perform less than the full range of sedentary work." She deemed Dr. Galhotra's opinion inconsistent with Trevizo's daily childcare activities, "as well as his own treatment notes." Specifically, the ALJ stated that Dr. Galhotra must be incorrect in opining that back pain would preclude Trevizo from sitting for more than three hours per day and standing or walking for more than two hours per day, because "the objective evidence only shows mild thoracic degenerative disc disease with no significant treatment for degenerative disc disease." She added that Dr. Galhotra's opinion conflicted with Trevizo's testimony that she could walk half a mile at a time and went to the grocery store once per week for an hour and a half. The ALJ did not expressly find that Dr. Galhotra's opinion was contradicted by any of the other physicians, but we can infer from the record that on at least two points Dr. Galhotra's

opinion was inconsistent with Dr. Quinones'—standing or walking and sitting within an eight-hour workday.

Nevertheless, the ALJ's outright rejection of Dr. Galhotra's opinion was legally erroneous. First, the ALJ erred by failing to apply the appropriate factors in determining the extent to which the opinion should be credited. Though she suggested that Dr. Galhotra's opinion was "inconsistent with the other substantial evidence in [Trevizo's] case record," such that it should not be given dispositive weight, 20 C.F.R. § 404.1527(c)(2), the ALJ did not consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion, *id.* § 404.1527(c)(2)–(6). This failure alone constitutes reversible legal error.

Moreover, the ALJ did not offer "specific and legitimate" reasons for rejecting Dr. Galhotra's opinion. *Ryan*, 528 F.3d at 1198 (quoting *Bayliss*, 427 F.3d at 1216). Though the ALJ repeatedly pointed to Trevizo's responsibilities caring for her young adoptive children as a reason for rejecting her disability claim, the record provides no details as to what Trevizo's regular childcare activities involved. The ALJ did not develop a record regarding the extent to which and the frequency with which Trevizo picked up the children, played with them, bathed them, ran after them, or did any other tasks that might undermine her claimed limitations, nor did the ALJ inquire into whether Trevizo cared for the children alone or with the assistance of her grandchildren or other family members. The only childcare responsibilities identified at the hearing were one-off events, such as taking the children to the doctor or attending hearings (often by phone). Absent specific details about Trevizo's childcare responsibilities,

those tasks cannot constitute "substantial evidence" inconsistent with Dr. Galhotra's informed opinion, and thus the ALJ improperly relied on Trevizo's childcare activities to reject the treating physician opinion.[2]  There is also no reason that Dr. Galhotra's opinion—that Trevizo can frequently lift or carry 20 pounds, stand or walk for less than two hours per eight-hour workday, and sit for no more than three hours per workday—is contradicted by her self-reported ability to walk for 30 minutes and go grocery shopping for an hour and a half once per week.   These limited activities are entirely consistent with the medical opinion.

The ALJ's conclusory determination that Dr. Galhotra's opinion was contradicted by his treatment notes and her reliance on the mildness of Trevizo's thoracic degenerative disc disease[3] as evidence of Trevizo's capacity to do work are inapposite.  Far from "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings," *Magallanes*, 881 F.2d at 751 (quoting *Cotton*, 799 F.2d at

---

[2] The ALJ did not rely on the fact that Trevizo had been licensed as a foster parent as a basis for denying her claim, and we therefore cannot consider Trevizo's status as a licensed foster parent as a reason to affirm the ALJ's decision. *See Garrison*, 759 F.3d at 1009.  Nonetheless, we note that Trevizo went through the licensing process ten years prior to her 2012 ALJ hearing, well before the 2008 onset of her disability.  In addition, while Trevizo testified that she received a written opinion from a doctor that she was able to care for her adoptive children, the record does not indicate when that opinion was written and whether it was before or after August 2008.

[3] A diagnostic imaging service found "[m]ild scoliosis and thoracic spine degenerative disc change."  It is unclear whether both the scoliosis and the degenerative disc change were being described as mild or whether the word "mild" was intended to refer only to the scoliosis.

1408), the ALJ pointed to nothing in Dr. Galhotra's treatment notes or elsewhere in the clinical record that contradicted the treating physician's opinion.

In fact, Dr. Galhotra's treatment notes reveal that Trevizo complained of lower back pain during at least 16 appointments with him between May 2008 and August 2012, and he has repeatedly noted that she suffers from chronic lumbago, making his assessment of her back pain and her attendant physical limitations wholly consistent with his treatment notes and course of treatment. Dr. Galhotra's notes reflect that he prescribed Trevizo both Vicodin and Tramadol hydrochloride for her invertebral disc degeneration, and he routinely counseled her about weight loss, exercise, and diet. Though the ALJ identified the absence of more aggressive interventions for Trevizo's back pain (such as "an MRI, steroid injections, block injections, recommendations for surgery, or even a referral to an orthopedic surgeon") as a reason for considering the pain to be "non-severe," she did not rely on it as a basis for rejecting Dr. Galhotra's opinion. Moreover, the failure of a treating physician to recommend a more aggressive course of treatment, absent more, is not a legitimate reason to discount the physician's subsequent medical opinion about the extent of disability. Finally, other doctors have diagnosed Trevizo with psoriatic arthritis, which is a further basis for back and joint pain separate from degenerative disc disease that is consistent with Dr. Galhotra's opinion.

The ALJ did not follow the appropriate methodology for weighting a treating physician's medical opinion, and there is no legitimate stated reason for rejecting Dr. Galhotra's opinion. As such, we conclude that the ALJ erred by giving the opinion "little weight" and instead should have found it to

be controlling.  Because the VE testified that a claimant with the physical limitations outlined in Dr. Galhotra's medical opinion would be unable to do any full-time work, Dr. Galhotra's opinion "*alone* establishes that [Trevizo] is entitled to benefits." *Lingenfelter*, 504 F.3d at 1041 n.12. The ALJ should have credited Dr. Galhotra's opinion and found that Trevizo was disabled, and the district court erred by developing its own reasons to discount Dr. Galhotra's opinion, rather than reviewing the ALJ's reasons for substantial evidence.[4]

---

[4] The district court considered Dr. Galhotra to be a contradicted treating physician, because his medical opinion conflicted with nonexamining physician Dr. Quinones' opinion that Trevizo could "perform light work with some limitations."  The district court also criticized Dr. Galhotra's opinion as a "check-the-box form in which Dr. Galhotra cited no medical evidence for the restrictions he assessed." Finally, the district court noted the "normal physical exams of [Trevizo's] back and joints" in Dr. Galhotra's records as a basis for finding his opinion was inconsistent with his treatment notes.  First, we rely only on the ALJ's stated bases for rejecting Trevizo's disability claims.  *See Garrison*, 759 F.3d at 1009.  Because the ALJ did not provide these explanations herself as a reason to reject Dr. Galhotra's opinion, the district court erred in looking to the remainder of the record to support the ALJ's decision, and we cannot affirm on those grounds.  Moreover, the ALJ was not entitled to reject the responses of a treating physician without specific and legitimate reasons for doing so, even where those responses were provided on a "check-the-box" form, were not accompanied by comments, and did not indicate to the ALJ the basis for the physician's answers.  *See Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). Finally, there is no authority that a "check-the-box" form is any less reliable than any other type of form; indeed, agency physicians routinely use these types of forms to assess the intensity, persistence, or limiting effects of impairments.

## IV.

We have established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited:

> First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. In this analysis, the claimant is *not* required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof.

> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases.

*Garrison*, 759 F.3d at 1014–15 (citations omitted) (internal quotation marks omitted).**[5]**   The ALJ recited boilerplate language confirming that Trevizo had met the first prong of this test but failed at the second, and made no finding of malingering:  "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."**[6]**   To make the latter finding, the ALJ was

---

**[5]** At the time of the ALJ's decision, there was a Social Security Ruling ("SSR") that "clarif[ied] when the evaluation of symptoms, including pain, . . . requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; . . . explain[ed] the factors to be considered in assessing the credibility of the individual's statements about symptoms; and . . . state[d] the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision." SSR 96-7p (1996).  In March 2016, that ruling was superseded to "eliminat[e] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term" and to "clarify that subjective symptom evaluation is not an examination of an individual's character" but instead was meant to be consistent with "our regulatory language regarding symptom evaluation." SSR 16-3p (2016).  This ruling makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to "evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness. *Id.*

**[6]** "ALJs routinely include this statement in their written findings as an introduction to the ALJ's credibility determination" before "identify[ing] what parts of the claimant's testimony were not credible and why." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir.

required to provide specific, clear, and convincing reasons to discount the alleged severity of Trevizo's subjective symptoms and pain. *See Lingenfelter*, 504 F.3d at 1036. We find that the ALJ committed further error in discounting Trevizo's testimony regarding her subjective symptoms.

## A.   Severity of psoriasis, back and joint pain, and weakness.

The ALJ erred in finding that Trevizo's psoriasis and pain were "not as severe as alleged." The medical record demonstrates that Trevizo's psoriasis is severe, covering a substantial percentage of her BSA and failing to respond to myriad aggressive treatments. The reasons the ALJ gave for doubting Trevizo's statements regarding her psoriasis are not "clear and convincing."

The ALJ discredited Trevizo's claim that she was unable to walk for long distances given the psoriatic plaques on her feet because "treatment notes consistently state that her feet appeared normal." This is incorrect. After five of Trevizo's medical visits with Dr. Galhotra (out of 22 in the record), his notes state, "The feet showed a normal appearance" and "No ulcer was seen on the feet." "Occasional symptom-free periods . . . are not inconsistent with disability," *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995), and an ALJ "may

2014). The use of this generic language is not itself reversible error, *see id.*, but it inverts the responsibility of an ALJ, which is first to determine the medical impairments of a claimant based on the record and the claimant's credible symptom testimony and only *then* to determine the claimant's RFC. By rejecting a claimant's subjective symptoms "to the extent they are inconsistent with the above residual functional capacity assessment," the agency indicates that it is failing properly to incorporate a claimant's testimony regarding subjective symptoms and pain into the RFC finding, as it is required to do.

not disregard [a claimant's testimony] solely because it is not substantiated affirmatively by objective medical evidence," *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). It does not discredit Trevizo's symptom testimony if her feet were not *invariably* covered in sores, particularly in light of treatment notes showing that up to 90 percent of Trevizo's BSA was covered in psoriatic plaques at various points in her treatment.[7] Where Dr. Galhotra's notes otherwise reference Trevizo's feet, it is to explain that "[a] self-exam of the feet was performed"; that her "[b]alance was normal and gait and stance were normal"; and that a "[m]onofilament wire test of the foot was normal." None of these statements supports the ALJ's determination that "treatment notes consistently state that her feet appeared normal."

The ALJ discounted the severity of Trevizo's joint pain because Trevizo "did not take narcotic medications due to pain." A claimant's subjective symptom testimony may be undermined by "an unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment. While there are any number of good reasons for not doing so, a claimant's failure to assert one, or a finding by the ALJ that the profferred [sic] reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citations omitted). The record reflects only one instance in which Trevizo was prescribed narcotics: Trevizo told Dr. Ackerman that when

---

[7] It is also not clear that Dr. Galhotra's notes signify that there were no plaques on Trevizo's feet. The word "ulcer" refers to foot ulcers caused by diabetes; Dr. Galhotra likely checked for diabetic ulcers and recorded that Trevizo's feet had a "normal appearance" when no such ulcers appeared.

she went to the emergency department for elbow pain she "was given a prescription for oxycodone but did not take it as she was fearful of becoming narcotic addicted. Instead she took hydroxyzine which she says kept her pain under control." The ALJ did not address the believability of Trevizo's proffered reasons: her fear of becoming addicted to narcotics and the ability of alternate drugs to control her pain. The ALJ's weighing of Trevizo's failure to take narcotics against her credibility was thus erroneous.[8] The ALJ also found Trevizo's back pain not to be "severe," an assertion we discuss above.

The ALJ discredited Trevizo's testimony regarding her "weak grip and numbness in her fingers" because she found that Dr. House wrote that Trevizo "displayed a normal grip." It is uncontradicted that Trevizo received carpal tunnel surgery on both hands. Her primary care physician noted substantial physical limitations in her gripping ability as a result. The ALJ offered no basis, much less a "clear and convincing" one, for crediting the opinion of an examining psychologist with respect to Trevizo's grip over that of Trevizo's primary treating physician and Trevizo's own testimony. Moreover, Dr. House merely observed that

---

[8] Furthermore, it is inappropriate to factor against Trevizo's symptom testimony that she declined to take prescribed narcotics because she feared addiction and instead took other medication that addressed her pain. Taken to its logical conclusion, this could amount to a requirement that patients take any prescribed pain medications, regardless of their addictive or dangerous qualities, simply to avoid being found to have exaggerated pain. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment.").

Trevizo "displayed a normal pencil grip." This signals only that Trevizo held a pencil in a normal manner and not that there were no limitations to her gripping strength or fine or gross manipulation abilities, which Dr. House would have been in no position to assess.

## B. Severity of diabetes.

"[T]he treatment records must be viewed in light of the overall diagnostic record." *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014). Read as a whole, the treatment notes give credence to Trevizo's testimony about the severity of her diabetes, as it is uncontroverted that, even during periods of uninterrupted treatment, Trevizo suffers from uncontrolled diabetes. The specific reasons the ALJ gave for disbelieving Trevizo's testimony about the severity of her symptoms are not "clear and convincing."

The ALJ found Trevizo's claims of fatigue to be contradicted by the treatment notes because the notes "generally show denials of fatigue." Yet it is not inconsistent with disability that Trevizo was not entirely incapacitated by fatigue at all times, *Lester*, 81 F.3d at 833, and the treatment notes reflect that Trevizo reported weakness or fatigue at more than half of her appointments with Dr. Galhotra.

The ALJ critiqued Trevizo for periods of noncompliance with treatment that could not be explained by loss of insurance. Failure to follow prescribed treatment may "cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603. One such instance of noncompliance was when Trevizo first broke out in psoriatic plaques and told Dr. Galhotra she was noncompliant with her Metformin because she feared it was causing her rash. The ALJ did not

evaluate that claim or find it to be unbelievable, and this instance of noncompliance therefore cannot be counted against Trevizo. *Id.* The ALJ similarly noted that Trevizo's claims that she "could not afford her medications" fell "during periods in which she had insurance and was regularly seeking treatment." This seems to suggest that it is inherently unbelievable that a person who had insurance and was seeking treatment would be unable to afford medication. Yet there is no reason to believe that because Trevizo could afford doctors' visits, she could *also* afford doctors' visits coupled with expensive pharmaceuticals, and nothing in the record contradicts Trevizo's claims that she was at times noncompliant with medication because she could not afford it.[9] "Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). At a handful of other medical visits, treating doctors expressed concerns with Trevizo's compliance without giving any explanation as to why Trevizo might be noncompliant. These instances of noncompliance may properly be weighed against finding Trevizo's testimony to be believable.

---

[9] Moreover, depending on the type of insurance coverage Trevizo had, her plan might not have covered the entire cost of her various prescriptions. *See, e.g.*, Suzanne M. Kirchhoff et al., Cong. Research Serv., R44832, Frequently Asked Questions About Prescription Drug Pricing and Policy 11 (2017) ("During the past several years, health plans have been imposing higher cost sharing for prescription drugs in an effort to control spending and costs."); Office of the Assistant Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs., *Prescription Drugs: Innovation, Spending, and Patient Access* 12 ( 2016) ("[T]he out-of-pocket costs associated with some prescription drugs may result in financial hardship for patients and their families, even if they have health insurance."). The ALJ did not question Trevizo about the nature of her insurance plan's prescription drug coverage before reaching her conclusion.

The ALJ suggested that "complaints of dizziness elevated when [Trevizo] was medically noncompliant with her diabetes medication" and that the ALJ expected that "with medication compliance, . . . her dizziness would improve." The ALJ cited no treatment notes corroborating this assertion, no doctor made the connection between Trevizo's dizziness and medication noncompliance, and the record does not substantiate this belief.

## C. Inability to concentrate and inconclusive answers to questions.

The ALJ considered Trevizo's prior work to "undercut[] her allegations of being unable to concentrate" and "show[] that she is able to perform more than she alleges." Trevizo testified that she had difficulty concentrating because she was "distracted either by pain or fatigue or itchiness" and that she lost track of chores because she needed to take a shower to relieve her symptoms. Trevizo's psoriasis and related symptoms postdate her time as a cashier, and there is no reason that this prior work would contradict new difficulties in concentration caused by her symptoms. To the extent that the record reflects a claim that Trevizo struggles with concentration because of her borderline intellectual functioning, Dr. House is the one who made those statements after his evaluation; regardless of whether the ALJ thought Dr. House was correct about Trevizo's intellectual limitations, his findings cannot be counted against *Trevizo's* believability.

The ALJ also cited Trevizo's "inconsistent statements about why she stopped working." The ALJ noted that Trevizo alleged that she had "stopped working as a security guard due to flares with psoriasis" but had also "reported to

Dr. House that she quit the job," asserting that those statements were contradictory. Yet there is no inconsistency between the two assertions. Moreover, the ALJ herself noted that Trevizo had struggled to answer Dr. House's questions with clarity, suggesting, "Her inability to answer questions is more likely related to her possible borderline intellectual functioning." The ALJ did not explain why in some circumstances Trevizo's confused answers to questions should be attributed to her intellectual limitations, whereas when considering Trevizo's symptom claims those answers suggested a lack of credibility.

## D.  *Childcare activities.*

The ALJ again stressed the view that Trevizo's childcare responsibilities undermined her claims. "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim*, 763 F.3d at 1165. As discussed above, however, there is almost no information in the record about Trevizo's childcare activities; the mere fact that she cares for small children does not constitute an adequately specific conflict with her reported limitations. Moreover, "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Fair*, 885 F.2d at 603. That appears to be the case here, where Trevizo's childcare responsibilities permit her to rest, take naps, and shower repeatedly throughout the day, all of which would be impossible at a traditional full-time job.

## E.  *Summary of factors for discounting symptom testimony.*

As the foregoing discussion explains, the vast majority of the ALJ's bases for rejecting Trevizo's testimony were legally or factually erroneous. The sole remaining reason for discounting Trevizo's symptom testimony is several unexplained instances of noncompliance with diabetes medication.[10] This does not constitute substantial evidence supporting a finding that Trevizo's symptoms were not as severe as she testified, particularly in light of the extensive medical record objectively verifying her claims.

## V.

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (remanding for determination of benefits where the panel was "convinced that substantial evidence does not support the Secretary's decision, and because no legitimate reasons were advanced to justify disregard of the treating physician's opinion"). "[I]f additional proceedings can remedy defects in the original administrative proceeding,

---

[10] The government cites two additional credibility findings the ALJ purportedly made: Trevizo's allegedly inconsistent responses about why she gets headaches and the lack of objective medical evidence about Trevizo's ankle pain. Because the discussion of those issues is not in the section of the ALJ's decision addressing Trevizo's symptom testimony, they are not properly considered credibility findings. Nonetheless, there is no basis for assuming that Trevizo should know the underlying cause of her medical conditions, and her confusion about why she gets headaches should not be counted against her. With respect to Trevizo's ankle pain, the absence of medical records regarding alleged symptoms is not itself enough to discredit a claimant's testimony. *See Robbins*, 466 F.3d at 883. Moreover, the record reflects that Trevizo has Achilles tendinitis and heel and Achilles bone spurs, supporting her subjective symptom testimony.

a social security case should be remanded" for further proceedings. *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)). Generally, however, where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," *id.* at 1020, we remand for an award of benefits.[11]

We conclude that each of the credit-as-true factors is satisfied and thus that remand for the calculation and award of benefits is warranted. First, the record is extensive. It totals hundreds of pages and includes treatment notes documenting more than 50 doctors' visits addressing Trevizo's various medical conditions within the relevant time period. The record also reflects Trevizo's testimony before the ALJ, her responses to numerous questionnaires about her physical and mental limitations, and the responses of her granddaughter, all of which corroborate her impairments. Dr. Galhotra's opinion is developed and substantiated by his long-term treatment relationship with Trevizo. Moreover, the VE specifically opined regarding the inability of an individual with Trevizo's physical and intellectual limitations as described by Dr. Galhotra to sustain work.

---

[11] In rare instances, though each of the credit-as-true factors is met, the record as a whole leaves serious doubt as to whether the claimant is actually disabled, *see Garrison*, 759 F.3d at 1021, in which case we remand for further development of the record.

The other two prongs of the *Garrison* test are also satisfied. The ALJ failed to provide legally sufficient reasons for rejecting the informed medical opinion of Trevizo's primary treating physician and instead improperly substituted her judgment for that of the doctor. If credited as true, Dr. Galhotra's opinion establishes that Trevizo is disabled, because the VE testified that someone with Trevizo's limitations would be unable to find full-time work. Finally, there is no "serious doubt" based on "an evaluation of the record as a whole" that Trevizo is, in fact, disabled, given her severe impairments of diabetes and psoriasis; the combination of other conditions from which she suffers, including obesity, psoriatic arthritis, and borderline intellectual functioning; and her advanced age. Thus, the requirements of the *Garrison* test are met.

Moreover, the "exceptional facts" of this case, *Terry v. Sullivan*, 903 F.2d 1273, 1280 (9th Cir. 1990), counsel strongly in favor of remanding for immediate payment of benefits. Trevizo is 65 years old, and she first sought benefits more than seven years ago; her claimed disability began almost a decade ago. She has extensive medical needs requiring significant care, and she has frequently lacked medical insurance and been unable to afford necessary treatment. "[F]urther delays at this point would be unduly burdensome." *Id.* (exercising discretion to order payment of benefits where the claimant was 64 years old and had applied for benefits nearly four years earlier, despite a lack of development in the record about a job for which the claimant was purportedly qualified); *see also Smolen*, 80 F.3d at 1292 (remanding for determination of benefits where the claimant had "already waited over seven years for her disability determination"). We therefore reverse the judgment of the

district court with instructions to remand to the ALJ for the calculation and award of benefits.

**REVERSED; REMANDED WITH INSTRUCTIONS.**